1   Juanita R. Brooks (SBN 75934), brooks@fr.com
    Lara S. Garner (SBN 234701), lgarner@fr.com
2   Justin M. Barnes (SBN 217517), barnes@fr.com
    Fish & Richardson P.C.
3   12390 El Camino Real
    San Diego, CA  92130
4   Telephone:  (858) 678-5070
    Facsimile:  (858) 678-5099
5
    Kelly C. Hunsaker (SBN 168307), hunsaker@fr.com
6   Fish & Richardson P.C.
    500 Arguello Street, Suite 500
7   Redwood City, CA  94063
    Telephone:  (650) 839-5070
8   Facsimile:  (650) 839-5071

9   Attorneys for Defendants LG Electronics, Inc., LG Electronics U.S.A., Inc., LG Electronics
    Mobilecomm U.S.A.
10

11                    UNITED STATES DISTRICT COURT

12                  SOUTHERN DISTRICT OF CALIFORNIA

| 13 | MULTIMEDIA PATENT TRUST, | Case No. 10-CV-2618 H (CAB) |
|---|---|---|
| 14 | Plaintiff, | |
| 15 | v. | **ANSWER** |
| | | **JURY TRIAL DEMANDED** |
| 16 | APPLE INC.; CANON, INC.; CANON U.S.A., INC.; LG ELECTRONICS, INC.; LG ELECTRONICS U.S.A., INC.; LG ELECTRONICS MIBILECOMM U.S.A., INC.; TIVO, INC., | |
| 17 | | |
| 18 | | Hon. Marilyn L. Huff |
| 19 | Defendants, | |

20

21

22

23

24

25

26

27

28

**ANSWER TO COMPLAINT**

Defendants LG Electronics, Inc., LG Electronics U.S.A., Inc., LG Electronics Mobilecomm U.S.A. (collectively "LG Electronics") hereby respond to Plaintiff Multimedia Patent Trust's Complaint filed December 20, 2010, as follows:

**Jurisdiction and Venue**

1.    LG Electronics admits that this Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a) to the extent that Multimedia Patent Trust ("MPT") is able to demonstrate a proper claim for patent infringement.

2.    LG Electronics admits that venue in this District is proper under 28 U.S.C. §§ 1391(c) and 1400(b), but denies that venue is convenient for this case.

**Nature of the Action**

3.    LG Electronics admits that that MPT alleges infringement of United States Patent Nos. 4,958,226; 5,136,377; 5,227,878 and 5,500,678 and purports to base this action on the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*.  LG Electronics denies that MPT has alleged that LG Electronics infringes United States Patents No. 4 5,500,678 and 4,958,226.

**Parties**

4.    LG Electronics denies that that MPT is a valid Delaware Statutory Trust under the Delaware Statutory Trust Act (12 Del. C. §§ 3801 et seq.) or any other applicable laws of the State of Delaware.

5.    LG Electronics lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 of the Complaint, and therefore denies them.

6.    LG Electronics lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7 of the Complaint, and therefore denies them.

7.    LG Electronics lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8 of the Complaint, and therefore denies them.

8.    LG Electronics lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9 of the Complaint, and therefore denies them.

Case No. 10-CV-2618 H (CAB)

9.     LG Electronics admits that LG Electronics, Inc. is incorporated under the laws of the Republic of Korea and has place of business in Seoul, Republic of Korea.  LG Electronics admits that LG Electronics, Inc. manufactures products alleged by MPT to infringe. LG Electronics denies that LG Electronics, Inc. controls the decisions of LG U.S.A. and LG Mobilecomm to infringe or license MPT's patents.

10.    LG Electronics admits that LG U.S.A. is incorporated under the laws of the state of Delaware and has a place of business at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632.  LG Electronics admits that LG U.S.A.'s products accused by MPT of infringement are and have been offered for sale and sold in this and other judicial districts. LG Electronics admits that LG USA operates marketing and/or distribution facilities in this judicial district.

11.    LG Electronics admits that LG MobileComm is incorporated under the laws of the state of California and has a place of business at 10101 Old Grove Rd, San Diego, CA 92131.  LG Electronics admits that LG MobileComm's products accused by MPT of infringement are and have been offered for sale and sold in this and other judicial districts.

12.    LG Electronics admits that LG Electronics, Inc. and its agents LG U.S.A. and LG MobileComm have and continue to collaborate in the manufacture, marketing and sale, in the United States, of the LG products accused by MPT of infringement.

13.    LG Electronics lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11 of the Complaint, and therefore denies them.

## Background Facts and the Patents-in-Suit

14.    MPT's general characterizations of the patents-in-suit do not constitute facts requiring a response by LG Electronics.  To the extent that Paragraph 14 is deemed to require a response, LG Electronics denies the allegations of Paragraph 14.

15.    MPT's characterizations regarding video compression techniques do not constitute facts requiring a response by LG Electronics.  To the extent that Paragraph 15 is deemed to require a response, LG Electronics denies the allegations of Paragraph 15.

Case No. 10-CV-2618 H (CAB)

16.     MP's characterizations regarding of video compression do not constitute facts requiring a response by LG Electronics.  To the extent that Paragraph 16 is deemed to require a response, LG Electronics denies the allegations of Paragraph 16.

17.     MPT's characterizations regarding the benefits of video compression do not constitute facts requiring a response by LG Electronics.  To the extent that Paragraph 17 is deemed to require a response, LG Electronics denies the allegations of Paragraph 17.

18.     MPT's characterizations regarding video signal encoding do not constitute facts requiring a response by LG Electronics.  To the extent that Paragraph 18 is deemed to require a response, LG Electronics denies the allegations of Paragraph 18.

19.     LG Electronics denies the allegations contained in Paragraph 19 of the Complaint.

20.     LG Electronics admits that a copy of U.S. Patent No. 4,958,226 (the "Haskell '226 Patent") and an Ex Parte Reexamination Certificate were attached as Exhibit A to the Complaint. LG Electronics further admits that U.S. Patent No. 4,958,226 states on its face that: (a) it is entitled "Conditional Motion Compensated Interpolation of Digital Motion Video;" (b) it was issued on September 18, 1990; and (c) Barin Haskell and Atul Puri are named as inventors.  LG Electronics admits that the Ex Parte Reexamination Certificate states on its face that the patentability of claim 12 was confirmed and claims 1-11 were not reexamined.   Except as expressly admitted herein, LG Electronics lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 20 of the Complaint, and therefore denies them.

21.     LG Electronics admits that a copy of U.S. Patent No. 5,136,377 (the "Johnston '377 Patent") was attached as Exhibit B to the Complaint.  LG Electronics further admits that this copy states on its face that: (a) it is entitled "Adaptive Non-Linear Quantizer"; (b) it was issued on August 4, 1992; and (c) Johnston et al. are named as inventors.  Except as expressly admitted herein, LG Electronics lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 21 of the Complaint, and therefore denies them.

22.     LG Electronics admits that a copy of U.S. Patent No. 5,227,878 (the "Puri '878 Patent") and a Certificate of Correction of the Puri '878 Patent were attached as Exhibit C to the

Case No. 10-CV-2618 H (CAB)

Complaint.  LG Electronics further admits that the Puri '878 Patent states on its face that: (a) it is entitled "Adaptive Coding and Decoding of Frames and Fields of Video;" (b) it was issued on July 13, 1993; and (c) Atul Puri and Rangarajan Aravind are named as inventors.  Except as expressly admitted herein, LG Electronics lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 22 of the Complaint, and therefore denies them.

23.     LG Electronics admits that a copy of U.S. Patent No. 5,500,678 (the "Puri '678 Patent") and a Certificate of Correction of the Puri '678 Patent were attached as Exhibit D to the Complaint.  LG Electronics further admits that Puri '678 Patent states on its face that:  (a) it is entitled "Optimized Scanning of Transform Coefficients in Video Coding"; (b) it was issued on March 19, 1996; and (c) Puri is named as inventor.  Except as expressly admitted herein, LG Electronics lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 23 of the Complaint, and therefore denies them.

## COUNT I

### (Patent Infringement Against Apple)

24.     LG Electronics incorporates its responses to the allegations of Paragraphs 1 through 23 set forth above as if fully set forth herein.

25.     Paragraph 25 does not require a response by LG Electronics.  To the extent that Paragraph 25 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 35 and therefore denies the same.

26.     Paragraph 26 does not require a response by LG Electronics.  To the extent that Paragraph 26 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 26 and therefore denies the same.

27.     Paragraph 27 does not require a response by LG Electronics.  To the extent that Paragraph 27 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 27 and therefore denies the same.

Case No. 10-CV-2618 H (CAB)

28.     Paragraph 28 does not require a response by LG Electronics.  To the extent that Paragraph 28 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 28 and therefore denies the same.

29.     Paragraph 29 does not require a response by LG Electronics.  To the extent that Paragraph 29 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 29 and therefore denies the same.

30.     Paragraph 30 does not require a response by LG Electronics.  To the extent that Paragraph 30 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 30 and therefore denies the same.

31.     Paragraph 31 does not require a response by LG Electronics.  To the extent that Paragraph 31 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 31 and therefore denies the same.

32.     Paragraph 32 does not require a response by LG Electronics.  To the extent that Paragraph 32 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 32 and therefore denies the same.

33.     Paragraph 33 does not require a response by LG Electronics.  To the extent that Paragraph 33 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 33 and therefore denies the same.

## COUNT II

## (Patent Infringement Against Cannon)

34.     LG Electronics incorporates its responses to the allegations of Paragraphs 1 through 23 set forth above as if fully set forth herein.

35.     Paragraph 35 does not require a response by LG Electronics.  To the extent that Paragraph 35 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 35 and therefore denies the same.

36.     Paragraph 36 does not require a response by LG Electronics.  To the extent that Paragraph 36 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 36 and therefore denies the same.

37.     Paragraph 37 does not require a response by LG Electronics.  To the extent that Paragraph 37 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 37 and therefore denies the same.

38.     Paragraph 38 does not require a response by LG Electronics.  To the extent that Paragraph 38 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 38 and therefore denies the same.

39.     Paragraph 39 does not require a response by LG Electronics.  To the extent that Paragraph 39 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 39 and therefore denies the same.

40.     Paragraph 40 does not require a response by LG Electronics.  To the extent that Paragraph 40 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 40 and therefore denies the same.

41.     Paragraph 41 does not require a response by LG Electronics.  To the extent that Paragraph 41 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 41 and therefore denies the same.

42.     Paragraph 42 does not require a response by LG Electronics.  To the extent that Paragraph 6426 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 42 and therefore denies the same.

43.     Paragraph 43 does not require a response by LG Electronics.  To the extent that Paragraph 43 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 43 and therefore denies the same.

## **COUNT III**

### **(Patent Infringement Against LG)**

44.     LG Electronics incorporates its responses to the allegations of Paragraphs 1 through 23 set forth above as if fully set forth herein.

45.     LG Electronics admits that it makes, sells, and offers for sale in the United States products that are capable of encoding and decoding digital video but LG Electronics denies that it has infringed any valid, enforceable claim of any of the patents identified in the Complaint.

1   Except as so admitted, LG Electronics denies the remaining allegations of Paragraph 45 of the
2   Complaint.

3   46.    LG Electronics admits that some LG Electronics products encode and/or decode
4   video in compliance with some industry standards but LG Electronics denies that it has infringed
5   any valid, enforceable claim of any of the patents identified in the Complaint.  Except as so
6   admitted, LG Electronics denies the remaining allegations of Paragraph 46 of the Complaint.

7   47.    LG Electronics denies the allegations contained in Paragraph 47 of the Complaint.

8   48.    LG Electronics denies the allegations contained in Paragraph 48 of the Complaint.

9   49.    LG Electronics denies the allegations contained in Paragraph 49 of the Complaint.

10  50.    LG Electronics admits that at some point after August 13, 2008 it received
11  correspondence from MPT dated August 13, 2008.  Except as so admitted, LG Electronics denies
12  the remaining allegations of Paragraph 50 of the Complaint.

13  **COUNT IV**

14  **(Patent Infringement Against TiVo)**

15  51.    LG Electronics incorporates its responses to the allegations of Paragraphs 1 through
16  23 set forth above as if fully set forth herein.

17  52.    Paragraph 52 does not require a response by LG Electronics.  To the extent that
18  Paragraph 52 is deemed to require a response, LG Electronics lacks knowledge sufficient to
19  confirm or deny the allegations of Paragraph 52 and therefore denies the same.

20  53.    Paragraph 53 does not require a response by LG Electronics.  To the extent that
21  Paragraph 53 is deemed to require a response, LG Electronics lacks knowledge sufficient to
22  confirm or deny the allegations of Paragraph 53 and therefore denies the same.

23  54.    Paragraph 54 does not require a response by LG Electronics.  To the extent that
24  Paragraph 54 is deemed to require a response, LG Electronics lacks knowledge sufficient to
25  confirm or deny the allegations of Paragraph 54 and therefore denies the same.

26  55.    Paragraph 55 does not require a response by LG Electronics.  To the extent that
27  Paragraph 55 is deemed to require a response, LG Electronics lacks knowledge sufficient to
28  confirm or deny the allegations of Paragraph 55 and therefore denies the same.

Case No. 10-CV-2618 H (CAB)

56.     Paragraph 56 does not require a response by LG Electronics.  To the extent that Paragraph 56 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 56 and therefore denies the same.

57.     Paragraph 57 does not require a response by LG Electronics.  To the extent that Paragraph 57 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 57 and therefore denies the same.

58.     Paragraph 58 does not require a response by LG Electronics.  To the extent that Paragraph 58 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 58 and therefore denies the same.

59.     Paragraph 59 does not require a response by LG Electronics.  To the extent that Paragraph 59 is deemed to require a response, LG Electronics lacks knowledge sufficient to confirm or deny the allegations of Paragraph 59 and therefore denies the same.

## RESPONSE TO MPT'S PRAYER FOR RELIEF

60.     LG Electronics states that MPT's Prayer for Relief does not require a response.

61.     LG Electronics denies that MPT is entitled to any relief whatsoever from LG Electronics, as prayed for or otherwise.

62.     LG Electronics denies each and every allegation of the Complaint not already admitted or denied and further denies that MPT is entitled to any relief whatsoever from LG Electronics on the basis of any of the purported claims for relief contained in the Complaint.

## ADDITIONAL DEFENSES

63.     By way of further answer, LG Electronics states as follows.  By asserting these defenses, LG Electronics does not assume any burden of proof for any stated defense or waive any unstated defenses.  LG Electronics expressly reserves the right to allege and assert further additional defenses.  LG Electronics also expressly incorporates by reference herein all defenses pled by co-defendants in this action in their respective Answers to MPT's Complaint.

Case No. 10-CV-2618 H (CAB)

1

**FIRST AFFIRMATIVE DEFENSE**

2

**(Invalidity of the Asserted Patents)**

3        64.        Each purported claim of the Johnston '377 and Puri '878 Patents ("the Asserted

4    Patents") is invalid for failure to comply with one or more of the requirements of United States

5    Code, Title 35, including without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112, and the rules,

6    regulations, and laws pertaining thereto.

7

**SECOND AFFIRMATIVE DEFENSE**

8

**(Noninfringement of the Asserted Patents)**

9        65.        LG Electronics has not and does not infringe, contribute to the infringement of, or

10    actively induce others to infringe any valid, enforceable claim of any of the Asserted Patents,

11    either literally, or under the doctrine of equivalents.

12

**THIRD AFFIRMATIVE DEFENSE**

13

**(Issue Preclusion)**

14        66.        MPT is precluded from re-litigating any issue on which there was a finding adverse

15    to it in any prior litigation.

16

**FOURTH AFFIRMATIVE DEFENSE**

17

**(Prosecution History Estoppel)**

18        67.        MPT is estopped, based on statements, representations, and admissions made

19    during prosecution of the patent applications resulting in the Asserted Patents, from asserting any

20    interpretation of any valid, enforceable claims of the Asserted Patents that would be broad enough

21    to cover any of LG Electronics' products or services alleged to infringe the Asserted Patents, either

22    literally or by application of the doctrine of equivalents.

23

**FIFTH AFFIRMATIVE DEFENSE**

24

**(Failure to Mark)**

25        68.        On information and belief, MPT's purported claims for relief concerning the

26    Asserted Patents are limited by failure to comply with the marking and notice requirements of

27    35 U.S.C. § 287(a).

28

Case No. 10-CV-2618 H (CAB)

### SIXTH AFFIRMATIVE DEFENSE

#### (Waiver/Equitable Estoppel/Implied or Express License/Exhaustion)

69.     On information and belief, MPT is barred by the doctrines of waiver, equitable estoppel, implied or express license and/or exhaustion from enforcing the Asserted Patents against LG Electronics.

### SEVENTH AFFIRMATIVE DEFENSE

#### (Laches and/or Estoppel)

70.     MPT's claim for damages for past patent infringement against LG Electronics is limited under the doctrines of laches and/or estoppel.

### EIGHTH AFFIRMATIVE DEFENSE

#### (Limitation on Damages)

71.     MPT's recovery for alleged infringement of the Patents-in-Suit, if any, is limited to any alleged infringement committed no more than six years prior to the filing of its Complaint, pursuant to 35 U.S.C. § 286.

### NINTH AFFIRMATIVE DEFENSE

#### (Standing/Nonjoinder)

72.     MPT lacks sufficient substantial rights in the Patents-in-Suit to assert and maintain claims of patent infringement.

### TENTH AFFIRMATIVE DEFENSE

#### (License)

73.     On the basis of MPEG LA, LLC's conclusion that the Puri '878 Patent is essential to the MPEG-2 Standard and/or MPT's assertion of the essentiality of one or more of the Puri '878 Patent, or Johnston '377 Patent, MPT's claim for infringement of those patents is barred by a combination of (a) a Patent Portfolio License executed by MPEG LA, LLC with LG Electronics and/or LG Electronics' suppliers; (b) MPT's settlement with MPEG LA, MPT's execution of an MPEG LA Agreement Among Licensors and/or an MPEG LA License to the Licensing Administrator; and/or (c) Alcatel-Lucent's executed MPEG LA Agreement Among Licensors and/or MPEG LA License to the Licensing Administrator.  These agreements are applicable to one

Case No. 10-CV-2618 H (CAB)

or more of the Puri '878 Patent and Johnston '377 Patent and apply to the patents allegedly assigned to MPT, thereby extinguishing claims of patent infringement of one or more of the Puri '878 Patent and Johnston '377 Patent.

### ELEVENTH AFFIRMATIVE DEFENSE

### (Violation of Reasonable and Non-Discriminatory Licensing Agreement)

74.     On information and belief, as a condition of its participation in MPEG LA, MPT or its predecessors-in-interest agreed to license some or all of the Patents-in-suit on Reasonable and Nondiscriminatory (RAND) terms.  Accordingly MPT's damages are limited by that agreement.

### TWELFTH AFFIRMATIVE DEFENSE

### (Estoppel/Waiver)

75.     By its conduct during meetings of standards-setting organizations, MPT has waived its right to assert one or more of the Asserted Patents and/or is estopped from asserting its rights to one or more of the Asserted Patents.

### THIRTEENTH AFFIRMATIVE DEFENSE

### (Unenforceability of the Asserted Patents)

76.     The claims of the Asserted Patents are unenforceable as a result of inequitable conduct by the applicant(s), their attorney(s), and/or agent(s) and/or the person(s) involved in the preparation, filing, and/or prosecution of that patent.

### The '878 Puri Patent

77.     The Puri '878 Patent is unenforceable and void due to inequitable conduct that occurred during the application for and prosecution of the Patent.

78.     Individuals associated with the application for and prosecution of the Puri '878 Patent, including at least Atul Puri and Rangarajan Aravind, violated their duty of candor and good faith in dealing with the PTO by intentionally and deceptively failing to disclose material information to the PTO.

79.     The application for the Puri '878 Patent was filed on November 15, 1991. Atul Puri and Rangarajan Aravind were the named applicants for the Puri '878 Patent and are the named inventors listed on the Patent.

Case No. 10-CV-2618 H (CAB)

80.     Under Title 37, CFR § 1.56, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [PTO], which includes a duty to disclose to the [PTO] all information known to that individual to be material to patentability . . . ."  On February 28, 1992, Atul Puri and Rangarajan Aravind signed a sworn statement stating in pertinent part: "I believe I am an original, first and joint inventor of the subject matter which is claimed and for which a patent is sought on the invention entitled Adaptive Coding And Decoding Of Frame and Fields Of Video Signals the specification of which was filed on November 15, 1991 . . . .  I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, 1.56(a)."  At least Mr. Puri and Mr. Aravind did not perform their sworn duty to disclose information material to the examination of the application for the Puri '878 Patent.

81.     The Puri '878 Patent is entitled "Adaptive Coding and Decoding of Frame and Fields of Video Signals." According to the Summary of the Invention section of the Puri '878 Patent, the purported invention achieves improved compression of video data by using an adaptive video frame/field encoder and decoder.  As the Summary of the Invention section explains, "[t]his adaptive behavior involves changing between a process of coding and decoding information from a frame of video or coding and decoding information from a field of video."

82.     In a September 22, 1992 Office Action, the PTO rejected several claims of the Puri '878 Patent as anticipated by United States Patent No. 5,091,782 to Krause ("Krause").

83.     In a December 22, 1992 response to the PTO's September 22, 1992 Office Action, the applicants for the Puri '878 Patent attempted to distinguish Krause from the claimed invention. They argued as follows:

> Both field coding and frame coding occur at the same time during the operation of the apparatus shown in the Krause patent in contrast to the invention defined in claim 1 involving a selective one, but not both, of frame coding or field coding.  Clearly, the claimed invention avoids the necessity of doing two coding operations as in the Krause patent. The § 102 rejection of claims 1 and 2, therefore, ought to be withdrawn.

84.     In response to the applicants' argument, the Examiner issued a Notice of Allowability on January 26, 1993 that allowed claims 1-33 of the Puri '878 Patent.

Case No. 10-CV-2618 H (CAB)

85.    Claim 1 of the Puri '878 Patent recites, inter alia, the limitation "a means responsive to the digital video input signal for producing a field frame coding type signal which directs a selected one, but not both, of the frame coding means or the field coding means to code the digital video input signal."   This limitation corresponds to the purported distinction drawn by the applicants to the Puri '878 Patent between Krause and the claimed invention. The applicants for the Puri '878 Patent failed to disclose to the PTO during the prosecution of the Patent that producing a field frame coding type signal which directs a selected one, but not both, of the frame coding means or the field coding means to code the digital video input signal was known in the prior art.   Moreover, the applicants for the Puri '878 Patent failed to disclose to the PTO that adaptive coding of frame and fields of video signals known in the prior art.

86.    For example, a journal article entitled "Fixed and Adaptive Predictors for Hybrid Predictive/Transform Coding," written by Staffan Ericsson, was published in IEEE Transactions on Communications, vol. Com-33, no. 12 (Dec. 1985).   Under 35 U.S.C. § 102, the Ericsson article ("Ericsson") is prior art to the Puri '878 Patent.   Ericsson discloses adaptive coding of frames and fields of video signals.   The Abstract of Ericsson states: "Field coding with a switched predictor using previous field in moving areas is an interesting alternative to frame coding with frame difference prediction."   A person of skill in the art would understand that this sentence of the Abstract of Ericsson discloses adaptive coding of frames and fields of video signals.   In addition, a section of Ericsson entitled "Switched Prediction" states the following:

> In this section we propose an adaptive predictor which switches between frame difference prediction and a predictor more suitable for moving areas. . . . Table II shows prediction gain in moving areas for different predictors. It is found that the average of the horizontal and vertical neighbors in the previous field (predictor 2) gives 3 dB better prediction gain compared to frame difference prediction. . . . A candidate for further study is a predictor which switches between previous frame and previous field prediction, i.e., between predictors 1 and 2 in Table II.

A person of skill in the art would recognize that this excerpted passage discloses adaptive coding of frames and fields of video signals.

87.    As discussed above, the PTO allowed the Puri '878 Patent, including claim 1 of the Patent, to issue over Krause based upon the applicants' argument that Krause did not disclose adaptive coding of frames and fields of video signals.   Thus, Ericsson's disclosure of adaptive

coding of frames and fields of video signals was material to the patentability of the Puri '878 Patent, including the patentability of claim 1 of the Patent.  A person of ordinary skill in the art would have recognized the materiality of Ericsson to the patentability of the Puri '878 Patent, including the patentability of claim 1 of the Patent.

88.     Individuals involved in the prosecution of the Puri '878 Patent, including at least Atul Puri, were aware of Ericsson's disclosure of adaptive coding of frames and fields of video signals during the prosecution of the Patent.  Mr. Puri, in particular, was familiar with Ericsson's disclosure of adaptive coding of frames and fields of video signals during the prosecution of the Puri '878 Patent.  Mr. Puri had previously cited Ericsson in his doctoral thesis.  At least the Abstract of Ericsson would have alerted Mr. Puri to Ericsson's disclosure of adaptive coding of frames and fields of video signals.  Mr. Puri was aware of Ericsson's materiality to the patentability of the Puri '878 Patent, including the patentability of claim 1 of the Patent.

89.     Neither Mr. Puri nor any other individual involved in the application for and prosecution of the Puri '878 Patent disclosed Ericsson to the PTO.  Indeed, the individuals involved in the application for and prosecution of the Puri '878 Patent failed to disclose any art cumulative to the material disclosures in Ericsson during the prosecution of the Patent.

90.     At least Mr. Puri intended to deceive the PTO by intentionally failing to disclose Ericsson in the application for the Puri '878 Patent and throughout its prosecution (e.g., in the applicants' December 22, 1992 response to the PTO's September 22, 1992 Office Action).

91.     At least Mr. Puri's intentional failure to disclose Ericsson constitutes inequitable conduct that renders the Puri '878 Patent void and unenforceable.

92.      As another example, a journal article entitled "Movement Compensated Frame-Frequency Conversion of Television Signals," written by Hirohisa Yamaguchi, Takehiko Sugi, and Kouji Kinuhata, was published in IEEE Transactions on Communication, vol. Com-35, no. 1 (Oct. 1987). Under 35 U.S.C. § 102, this article ("Yamaguchi") is prior art to the Puri '878 Patent.

93.     Pages 1079-81 of Yamaguchi disclose adaptive coding of frames and fields of video signals. For example, page 1980 states:

> [T]he following adaptive interpolation algorithm has been simulated.
> 1) For the estimated movement, the corresponding value of a is examined.

Case No. 10-CV-2618 H (CAB)

2) When the value of a is less than a threshold T1, the movement-compensated interframe interpolation is applied.

3) When the value of a is between T1 and a larger threshold T2, the movement-compensated interfield interpolation is applied.

4) When the value of a exceeds the threshold T2, the temporal interpolation is applied.

A person of ordinary skill in the art would recognize that this excerpt of Yamaguchi discloses adaptive coding of frames and fields of video signals.

94.     As discussed above, the PTO allowed the Puri '878 Patent, including claim 1 of the Patent, to issue over Krause based upon the applicants' argument that Krause did not disclose adaptive coding of frames and fields of video signals.  Thus, Yamaguchi's disclosure of adaptive coding of frames and fields of video signals was material to the patentability of the Puri '878 Patent, including the patentability of claim 1 of the Patent.  Moreover, a person of ordinary skill in the art would recognize the materiality of Yamaguchi to the patentability of the Puri '878 Patent, including the patentability of claim 1 of the Patent.

95.     Individuals involved in the prosecution of the Puri '878 Patent, including at least Atul Puri, were aware of Yamaguchi's disclosure of adaptive coding of frame and fields of video signals during the prosecution of the Patent.  Mr. Puri, in particular, was familiar with Yamaguchi's disclosure of adaptive coding of frames and fields of video signals during the prosecution of the Puri '878 Patent.  Mr. Puri, along with Barin G. Haskell, had previously cited Yamaguchi as a reference in the application for the Haskell '226 Patent.  Mr. Puri was aware of Yamaguchi's materiality to the patentability of the Puri '878 Patent, including the patentability of claim 1 of the Patent.

96.     Neither Mr. Puri nor any other individual involved in the application for and prosecution of the Puri '878 Patent disclosed Yamaguchi to the PTO.  Indeed, the individuals involved in the application for and prosecution of the Puri '878 Patent failed to disclose any art cumulative to the material disclosures in Yamaguchi during the prosecution of the Patent.

97.     In addition, at least Mr. Puri intended to deceive the PTO by intentionally failing to disclose Yamaguchi in the application for the Puri '878 Patent and throughout its prosecution (e.g., in the applicants' December 22, 1992 response to the PTO's September 22, 1992 Office Action).

Case No. 10-CV-2618 H (CAB)

98.     At least Mr. Puri's intentional failure to disclose Yamaguchi constitutes inequitable conduct that renders the Puri '878 Patent void and unenforceable.

99.     As yet another example, the International Organization for Standardization held a conference in Santa Clara, California in August 1991 relating to the development of the MPEG-2 standard.  According to the conference's attendance list (MPEG91/180), Atul Puri attended that conference.  At the conference, Atul Puri learned even more about adaptive coding of frame and fields of video signals.

100.    A team from Columbia University presented a paper entitled "Technical Input to MPEG-2 Video Coding" at the Santa Clara conference.  The Columbia University paper was published with the identifier MPEG 91/131.  Under 35 U.S.C. § 102, the Columbia University paper is prior art to the Puri '878 Patent.  In addition, under 35 U.S.C. § 102, the presentation of the Columbia University paper at the Santa Clara conference is prior art to the Puri '878 Patent.

101.    The Columbia University paper discloses adaptive coding of frame and fields of video signals. For example, the Introduction to the Columbia University paper states, in its entirety:

> Hierarchical pyramidal coding provides convenient multiresolution coding, but the performance at the highest resolution is reduced, as was shown e.g., in the JPEG standard. For example, given an interlaced freeze-frame of a moving object, it makes sense to compress the first field and then the second field based on the reconstructed values of the first field (see, e. g., [4]).  However, if the frame contains no moving objects, the coding performance of the final result will be compromised by this two-stage approach. It is then preferable to code the fields jointly, because they are properly aligned. Similarly, in motion compensated predictive video coding, if an object has uniform motion, the error image contains properly aligned fields, and it may be preferable to compress them jointly.  This is not the case, however, when the object is accelerating, or at the critical areas around the edges of moving objects.  Accordingly, the decision on whether to code the fields separately or jointly must be taken on macroblock-by-macroblock basis.

A person of ordinary skill in the art would understand that the phrase "code the fields . . . jointly," as used in this excerpt, refers to coding of frames.  Thus, a person of ordinary skill in the art would recognize that the Columbia University paper discloses adaptive coding of frame and fields of video signals. In addition, a person of ordinary skill in the art would recognize the materiality of the Columbia University paper to the patentability of the Puri '878 Patent, including the patentability of claim 1 of the Patent.

102.    Individuals involved in the prosecution of the Puri '878 Patent, including at least Atul Puri, were aware of the Columbia University paper's disclosure of adaptive coding of frame and fields of video signals during the prosecution of the Patent.  Mr. Puri, in particular, was familiar with the Columbia University paper's disclosure of adaptive coding of frames and fields of video signals during the prosecution of the Puri '878 Patent, as he had learned about the contents of the paper at the Santa Clara conference.  Mr. Puri was aware of the materiality of the Columbia University paper to the patentability of the Puri '878 Patent, including the patentability of claim 1 of the Patent.  In addition, Mr. Puri was aware of the materiality of the presentation Columbia University paper at the Santa Clara conference to the patentability of the Puri '878 Patent, including the patentability of claim 1 of the Patent.

103.    In prior litigation involving the Puri '878 Patent, MPT has contended that Mr. Puri and Mr. Aravind conceived of the invention claimed in the Puri '878 Patent on a date prior to the Santa Clara conference.  In ostensible support of that contention, MPT submitted to this Court in Case No. 06-CV-0684-H (CAB) a declaration of Atul Puri, which attaches five exhibits.  (D.I. 226.)  None of the exhibits dated earlier than the Santa Clara conference discloses the following point of purported distinction between Krause and claim 1 of the Puri '878 Patent made by the applicants for the Patent during its prosecution: "Both field coding and frame coding occur at the same time during the operation of the apparatus shown in the Krause patent in contrast to the invention defined in claim 1 involving a selective one, but not both, of frame coding or field coding."  Exhibit A to the Puri declaration is dated after the Santa Clara conference.  Exhibit B to the Puri declaration fails to disclose a selective one, but not both, of frame coding or field coding.  Exhibit C to the Puri declaration fails to disclose a selective one, but not both, of frame coding or field coding.  Exhibit D to the Puri declaration fails to disclose a selective one, but not both, of frame coding or field coding.  Exhibit E to the Puri declaration fails to disclose a selective one, but not both, of frame coding or field coding.

104.    Regardless of whether Mr. Puri and Mr. Aravind conceived of the alleged invention claimed by the Puri '878 Patent prior to the Santa Clara conference, Mr. Puri had a duty to disclose

the Columbia University paper to the PTO. In addition, Mr. Puri had a duty to disclose the presentation of the Columbia University paper at the Santa Clara conference to the PTO.

105. The applicants for the Puri '878 Patent did not allege during the prosecution of the Patent that it was entitled to a priority date earlier than the Santa Clara conference. Moreover, the examiner lacked evidence sufficient to determine that the Puri '878 Patent is entitled to a priority date earlier than the Santa Clara conference. Lacking evidence sufficient to determine that the Puri '878 Patent is entitled to a priority date earlier than the Santa Clara conference, a reasonable examiner would have deemed the Columbia University paper to be prior art to the Puri '878 Patent. In addition, lacking evidence sufficient to determine that the Puri '878 Patent is entitled to a priority date earlier than the Santa Clara conference, a reasonable examiner would have deemed the presentation of the Columbia University paper at the Santa Clara conference to be prior art to the Puri '878 Patent.

106. Furthermore, lacking evidence sufficient to determine that the Puri '878 Patent is entitled to a priority date earlier than the Santa Clara conference, a reasonable examiner would have been substantially likely to consider the Columbia University paper important in deciding whether to issue the Puri '878 Patent, including claim 1 of the Patent. In addition, lacking evidence sufficient to determine that the Puri '878 Patent is entitled to a priority date earlier than the Santa Clara conference, a reasonable examiner would have been substantially likely to consider the presentation of the Columbia University paper at the Santa Clara conference important in deciding whether to issue the Puri '878 Patent, including claim 1 of the Patent.

107. The individuals involved in the application for and prosecution of the Puri '878 Patent did not disclose either the Columbia University paper or its presentation at the Santa Clara conference to the PTO. Indeed, the individuals involved in the application for and prosecution of the Puri '878 Patent failed to disclose any art cumulative to either the material disclosures in the Columbia University paper or its presentation at the Santa Clara conference during the prosecution of the Patent.

108. At least Mr. Puri intended to deceive the PTO by intentionally failing to disclose the Columbia University paper and its presentation at the Santa Clara conference in the application

Case No. 10-CV-2618 H (CAB)

1  for the Puri '878 Patent and throughout its prosecution (e.g., in the applicants' December 22, 1992

2  response to the PTO's September 22, 1992 Office Action).

3       109.    At least Mr. Puri's intentional failure to disclose the Columbia University paper and

4  its presentation at the Santa Clara conference constitutes inequitable conduct that renders the Puri

5  '878 Patent void and unenforceable.

6       110.    Claim 32 of the Puri '878 Patent claims: "An apparatus for encoding digital video

7  signals, comprising:

8         a means for receiving digital video input signals; and
       a means for performing variable word length encoding adaptively in response to the video

9         input signals."

10       111.    Receiving digital video input signals was known in the prior art to the Puri '878

11  Patent.  For example, a person of ordinary skill in the art would know that digital video decoders

12  in the prior art received digital video input signals.  The applicants for the Puri '878 Patent failed

13  to inform the PTO that performing variable word length encoding selectively in response to video

14  input signals was known in the prior art as well.

15       112.    For example, the article "A Perceptually Tuned Sub-Band Image Coder with Image

16  Dependent Quantization and Post Quantization Data Compression," published in the Proceedings

17  of the 1989 IEEE International Conference on Acoustics, Speech, and Signal Processing and

18  authored by Robert J. Safranek and James D. Johnston, discloses performing variable word length

19  encoding selectively in response to video input signals.  The article ("Safranek/Johnston Article")

20  is prior art to the Puri '878 Patent under 35 U.S.C. § 102.  Mr. Safranek and Mr. Johnston were

21  colleagues of Mr. Puri and Mr. Aravind at AT&T Bell Laboratories.

22       113.    The Abstract of the Safranek/Johnston Article states:

23         One set of codebooks consisting of less than 100000 entries is used for all images, while
       the codebook subset used for any given image is dependent on the distribution of the

24         quantizer outputs for that image.

25  A person of skill in the art would recognize that the term "codebook," as used in the Abstract of the

26  Safranek/Johnston Article, refers to a codebook used in variable word length encoding.  A person

27  of skill in the art would recognize that the Abstract of the Safranek/Johnston Article discloses

28  performing variable word length encoding selectively in response to image input signals.

Case No. 10-CV-2618 H (CAB)

114.    Section 5 of the Safranek/Johnston Article states:

> Each non-zero block is encoded using one two or four dimensional Huffman codebooks. The codebook with the highest dimensionality that will fit the rate (i.e. lowest potential rate) is used for each block. The dimensionality of the codebook for each block is combined with the block activity information and transmitted for each sub-band that is not all zeros. The four dimensional codebook operates on 2x2 codeword blocks where each codeword has an absolute value of less than 4.  The two dimensional codebook operates on 2x1 codeword blocks where each codeword has an absolute value of less than 26. Likewise the one dimensional codebook operates on individual codewords of any size required to meet the perceptual threshold.

A person of ordinary skill in the art would recognize that Huffman coding is a type of variable word-length encoding. A person of ordinary skill in the art would recognize that Section 5 of the Safranek/Johnston Article discloses the function of performing variable word length encoding selectively in response to image input signals.

115.    A person of ordinary skill in the art would recognize that the Safranek/Johnston Article's disclosure of performing variable word length encoding selectively in response to image input signals is applicable in response to video input signals as well, since video input signals are composed in part of image input signals.   For example, in a subsequent article entitled "A Perceptually Tuned Sub-Band Image Coder," Mr. Safranek and Mr. Johnston declare:

> The motivation for this work has been to develop an image coder that will give nearly perceptually lossless coding of arbitrary input at as low a bitrate as possible.  With the predicted availability of moderate rate (64-128kbps) switched data networks, there will be increasing demand for transmission services utilizing high quality image transmission. Two examples of these services are remote slideshows and video catalogs.

Proc. SPIE Symp. Human Vision & Elec. Imaging: Models, Methods & Apps., Santa Clara, CA (Feb. 1990).  As another example, an article entitled "Interframe Coding with Variable Block-Size Motion Compensation," on which Atul Puri is the lead author, states that the disclosures in the Safranek/Johnston Article "significantly reduce[] the bits required for inter-frame video encoding." Proc. IEEE Global Comm. Conf., §§ 2.7.1-2.7.5 (Tokyo, Nov. 1987).  As yet another example, in an article entitled "Motion-Compensated Video Coding with Adaptive Perceptual Quantization," Mr. Puri and Mr. Aravind cite the Safranek/Johnston Article as a relevant "scheme[] for image and video compression." IEEE Trans. on Circuits and Sys. for Video Tech., vol. 1, No. 4, pp. 351-361 (Dec. 1991).

Case No. 10-CV-2618 H (CAB)

116.    A person of ordinary skill in the art would further recognize that the selective performance of variable word length encoding taught in the Safranek/Johnston Article could be made adaptive to the mode of motion compensation used in producing an estimate of a video signal.

117.    The Abstract of the Safranek/Johnston Article, combined with the knowledge of a person of ordinary skill in the art, renders obvious the limitation "performing variable word length encoding adaptively in response to the video input signals" of claim 32.  In addition, Section 5 of the Safranek/Johnston Article, combined with the knowledge of a person of ordinary skill in the art, renders obvious the limitation "performing variable word length encoding adaptively in response to the video input signals" of claim 32.

118.    A person of ordinary skill in the art would recognize that claim 32 of the Puri '878 Patent is obvious in view of the Safranek/Johnston Article and the knowledge of an ordinary person of skill in the art.

119.    A person of ordinary skill in the art would recognize the materiality of the Abstract of the Safranek/Johnston Article to the patentability of the Puri '878 Patent, including the patentability of claim 32 of the Patent.  In addition, a person of skill in the art would recognize the materiality of Section 5 of the Safranek/Johnston Article to the patentability of the Puri '878 Patent, including the patentability of claim 32 of the Patent.

120.    The individuals involved in the application for and prosecution of the Puri '878 Patent did not disclose the Safranek/Johnston Article to the PTO.  Indeed, the individuals involved in the application for and prosecution of the Puri '878 Patent did not disclose any art cumulative to the material disclosures in the Safranek/Johnston Article during the prosecution of the Patent.

121.    As noted above, both Mr. Puri and Mr. Aravind were aware of the Safranek/Johnston Article.  For example, Mr. Puri and Mr. Aravind cited the Safranek/Johnston Article in an article they authored that was published a month after the filing date of the Puri '878 Patent.  At least the Abstract of the Safranek/Johnston Article would have alerted Mr. Puri and Mr. Aravind to the Safranek/Johnston Article's disclosure of the selective performance of variable word length encoding in response to image input signals.  Furthermore, Mr. Puri and Mr. Aravind

Case No. 10-CV-2618 H (CAB)

were aware of the materiality of the Safranek/Johnston Article to the patentability of the Puri '878 Patent, including the patentability of claim 32 of the Patent.

122.   At least Mr. Puri intended to deceive the PTO by intentionally failing to disclose the Safranek/Johnston Article in the application for the and throughout its prosecution.   In addition, at least Mr. Aravind intended to deceive the PTO by intentionally failing to disclose the Safranek/Johnston Article in the application for the Puri '878 Patent and throughout its prosecution.

123.   At least Mr. Puri's intentional failure to disclose the Safranek/Johnston Article constitutes inequitable conduct that renders the Puri '878 Patent void and unenforceable.   In addition, at least Mr. Aravind's intentional failure to disclose the Safranek/Johnston Article constitutes inequitable conduct that renders the Puri '878 Patent void and unenforceable.

### The Johnston '377 Patent

124.   The Johnston '377 Patent is unenforceable and void due to inequitable conduct that occurred during the application for and prosecution of the Patent.

125.    Individuals associated with the application for and prosecution of the Johnston '377 Patent, including at least Peter H. Westerink, Arun N. Netravali, Robert J. Safranek, and James D. Johnston violated their duty of candor and good faith in dealing with the PTO by intentionally and deceptively failing to disclose material information to the PTO.

126.   The application for the Johnston '377 Patent was filed on December 11, 1990. Mr. Westerink, Mr. Netravali, Mr. Safranek, and Mr. Johnston were among the applicants for the Patent and are named as co-inventors on the Patent.

127.   Under Title 37, CFR § 1.56, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [PTO], which includes a duty to disclose to the [PTO] all information known to that individual to be material to patentability . . . ."  In February 1991, Mr. Netravali, Mr. Westerink, Mr. Safranek, and Mr. Johnston signed a sworn statement stating in pertinent part: "I believe I am an original, first and joint inventor of the subject matter which is claimed and for which a patent is sought on the invention entitled Adaptive Non-Linear Quantizer the specification of which was filed on

December 11, 1990 . . . .  I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, 1.56(a)." At least Mr. Netravali, Mr. Westerink, Mr. Safranek, and Mr. Johnston did not perform their sworn duty to disclose information material to the examination of the application for the Johnston '377 Patent.

128.    Claim 1 of the Johnston '377 Patent claims: "An encoder including a coder for developing encoder output signals from frame difference signals, prediction means responsive to said encoder output signals for predicting a next frame's signals, and means for developing said frame difference signals from applied next frame signals of an image frame and from output signals of said prediction means, the improvement comprising:

> said coder including controllable quantizer means that quantizes said difference signals in accordance with a quantization schema that varies with the dictates of a control signal; and
>
> said coder including means, responsive to said applied next frame signals, to develop said control signal, which control signal varies throughout said applied next frame with changes in at least one selected characteristic of said applied next frame signals.

129.    In a September 13, 1991 office action, the PTO rejected claims 1, 8, 9, and 11 of the Johnston '377 Patent as being anticipated by any one of five prior art references. For example, with respect to one of the references ("Hoelzlwimmer"), the examiner stated the following:

> In considering claim 1, Hoelzlwimmer discloses that 1) the claimed coder is met by the entropy device, 2) the claimed prediction means is met by the adder and memory, 3) the claimed means for developing is met by the subtractor, 4) the claimed controllable quantizer means is met by the quantizer and 5) the claimed means to develop said control signal is met by the buffer control means.

130.    In a January 17, 1992 response to the September 13, 1991 office action, the applicants for the Johnston '377 Patent purported to distinguish Hoelzlwimmer and the other four prior art references. For example, the applicants stated the following:

> Hoelzlwimmer's buffer control means is responsive to the output buffer. It is an "after-the-fact" arrangement. It is a feedback arrangement where the output of the buffer control means affects future input signals of the quantizer.  In contradistinction, claim 1 defines
>
> ...means, responsive to said applied next frame signals, to develop said control signal, which control signal varies throughout said applied next frame with changes in at least one selected characteristic of said applied next frame signals (emphasis supplied).

23

Case No. 10-CV-2618 H (CAB)

1    This means, as defined in claim 1, is nothing like the buffer control means described by
2    Hoelzlwimmer et al. It is forward looking, and it changes throughout the next frame with
     changes in at least one selected characteristic of the next frame signals.

3    131.   Forward-looking quantizer-control means that change throughout the next frame

4    with changes in at least one selected characteristic of the next frame signals – the Johnston '377

5    Patent applicants' purported point of distinction between the claimed invention and the prior art –

6    were known in the prior art.  The applicants for the Johnston '377 Patent failed to inform the PTO

7    of that fact.  Moreover, the quantization of difference signals in accordance with a quantization

8    schema that varies with the dictates of a control signal, wherein the control signal varies

9    throughout an applied next frame with changes in at least one selected characteristic of the applied

10   next frame signals, as recited by the functional limitations of claim 1 of the Patent, was known in

11   the prior art.  The applicants for the Johnston '377 Patent failed to inform the PTO of that fact.

12   132.   As one example, the book *Digital Pictures: Representation and Compression* (1st

13   ed. 1988) ("*Digital Pictures*"), co-authored by Mr. Haskell, was published over a year prior to the

14   filing date of the application for the Haskell '226 Patent. Under 35 U.S.C. § 102, *Digital Pictures*

15   is prior art to the Haskell '226 Patent.  At least pages 521-26 of *Digital Pictures*  disclose the

16   quantization of difference signals in accordance with a quantization schema that varies with the

17   dictates of a control signal, wherein the control signal varies throughout an applied next frame

18   with changes in at least one selected characteristic of the applied next frame signals. Under 35

19   U.S.C. § 102, Digital Pictures is prior art to the Johnston '377 Patent.

20   133.   Pages 521-26 of *Digital Pictures* disclose an adaptive quantization scheme. The

21   adaptive quantization scheme disclosed in pages 521-26 of *Digital Pictures* is expressly designed

22   to have an overall average bit-rate of 2.0 bits/pel.  In the scheme, blocks of DCT-transformed field

23   differentials for luminance are divided into sub-blocks.  The system determines whether each sub-

24   block should be deemed temporally active with respect to luminance.  If a sub-block is not deemed

25   temporally active, the system examines the spatial activity of the sub-block with respect to

26   luminance.  The selected quantization scheme then varies depending on the spatial activity $S_i$ of

27   the sub-block with respect to luminance.  Blocks that are more spatially active with respect to

28   luminance are encoded with more bits.

134.    A person of skill in the art would recognize that the spatial activities Si disclosed in pages 521-26 of *Digital Pictures* constitute a control signal for the adaptive quantizer.  In addition, a person of skill in the art would recognize that pages 521-26 of *Digital Pictures* disclose the quantization of difference signals in accordance with a quantization schema that varies with the dictates of a control signal, wherein the control signal varies throughout an applied next frame with changes in at least one selected characteristic of the applied next frame signals.

135.    A person of ordinary skill in the art would recognize that at least pages 521-26 of *Digital Pictures* are material to the patentability of the Johnston '377 Patent, including the patentability of claim 1 of the Patent. Indeed, pages 521-26 of *Digital Pictures* disclose the Johnston '377 Patent applicants' purported point of distinction between the claimed invention and the prior art.

136.    The individuals involved in the application for and prosecution of the Johnston '377 Patent did not disclose pages 521-26 of *Digital Pictures* to the PTO during the prosecution of the Patent.  Mr. Netravali, in particular, did not disclose pages 521-26 of Digital Pictures to the PTO. Indeed, the individuals involved in the application for and prosecution of the Johnston '377 Patent did not disclose any art cumulative to the material disclosures on pages 521-26 of *Digital Pictures* during the prosecution of the Patent.

137.    In the Background of the Invention section of the Johnston '377 Patent, the applicants for the Johnston '377 Patent instead referred the examiner to pages 537 et seq. of *Digital Pictures*:

> In "Design of Statistically Based Buffer Control Policies for Compressed Digital Video," Zdepski et al., an IEEE conference, 1989, pg. 1343-1349, describe an approach where the quantizer in the DPCM loop interacts with an adaptive mode control circuit. The circuit measures the number of bits generated by the quantizer and, based on preselected thresholds, decides for the next frame on one of eight possible quantizer step sizes.  The selected step size is employed for the next frame.  A similar approach is described in "Digital Pictures" by A. N. Netravali and B. G. Haskell, Plenum Press, 1988, pg. 537 et seq.

But unlike the adaptive quantization scheme described on pages 537 et seq., the adaptive quantization scheme described on pages 521-26 of *Digital Pictures* does not determine the quantizer step size for the next frame based on the number of bits generated by the quantizer in a previous frame.  Furthermore, unlike the adaptive quantization scheme described on pages 537 et

25

seq., the adaptive quantization scheme described on pages 521-26 of *Digital Pictures* involves quantizing difference signals in accordance with a quantization schema that varies with the dictates of a control signal, wherein the control signal varies throughout an applied next frame with changes in at least one selected characteristic of the applied next frame signals.

138.   The Johnston '377 Patent applicants' failure to cite the more relevant section of *Digital Pictures* during the prosecution of the Patent was intentionally misleading and deceptive.

139.   At least Mr. Netravali, as the co-author of *Digital Pictures*, was aware of the contents of pages 521-26 of Digital Pictures.  At least Mr. Netravali was aware of the materiality of pages 521-26 of Digital Pictures to the patentability of the Johnston '377 Patent, including the patentability of claim 1 of the Patent.

140.   At least Mr. Netravali's intentional failure to disclose pages 521-26 of *Digital Pictures* constitutes inequitable conduct that renders the Johnston '377 Patent void and unenforceable.

141.   As a second example, an article in the Proceedings of the IEEE, vol. 73, No. 4 (April 1985) entitled "Advances in Picture Coding," authored by Hans Musmann, Peter Pirsch, and Hans-Joachim Grallert, discloses the function of quantizing difference signals in accordance with a quantization schema that varies with the dictates of a control signal, wherein the control signal varies throughout an applied next frame with changes in at least one selected characteristic of the applied next frame signals. Under 35 U.S.C. § 102, the article ("Musmann Article") is prior art to the Johnston '377 Patent.  The Introduction to the Musmann Article declares that the authors had found an improved adaptive quantizer.  The Introduction goes on to state:

> Advances in transform coding are presented in Section IV. To optimize the quantization of the spectral coefficients the mean-square quantization error has been used as an optimization criterion in the past. New approaches try to control the quantization by the local picture content and to adapt the quantization to the characteristics of the human visual perception.

Pages 532-33 of the Musmann Article state:

> [A] picture can be divided into several segments which are quantized differently. . . . An adaptive quantizer can be realized by a set of L separate quantizers which are switched on by the activity value [determined for each segment of the picture].

Pages 532-33 of the Musmann Article disclose that the activity values may be based on

characteristics of a frame signal, such as the brightness differences between neighboring pels.

142. A person of skill in the art would recognize that the "activity values" referenced in the above-excerpted passage of the Musmann Article are a control signal for the adaptive quantizer. In addition, a person of skill in the art would recognize that pages 532-33 of the Musmann Article disclose the quantization of difference signals in accordance with a quantization schema that varies with the dictates of a control signal, wherein the control signal varies throughout an applied next frame with changes in at least one selected characteristic of the applied next frame signals.

143. For these reasons, a person of ordinary skill in the art would recognize that at least pages 532-33 of the Musmann Article are material to the patentability of the Johnston '377 Patent, including claim 1 of the Patent. Indeed, pages 532-33 of the Musmann Article disclose the Johnston '377 Patent applicants' purported point of distinction between the claimed invention and the prior art.

144. At least Mr. Netravali and Mr. Westerink were aware of the material contents of the Musmann Article, including its disclosure of an improved adaptive quantizer. Figure 5.6.4 on page 473 of *Digital Pictures*, which Mr. Netravali coauthored, is taken directly from Figure 37 of the Musmann Article. At least the Introduction of the Musmann Article would have alerted Mr. Netravali to the Musmann Article's disclosure of the quantization of difference signals in accordance with a quantization schema that varies with the dictates of a control signal, wherein the control signal varies throughout an applied next frame with changes in at least one selected characteristic of the applied next frame signals. As another example, Mr. Westerink was the lead author of an article entitled "Subband Coding of Images Sequences at Low Bit Rates," in which he cited the entire Musmann Article as a reference. Signal Processing: Image Comm., vol. 2, issue 4, pp. 441-48 (Dec. 1990). At least the Introduction of the Musmann Article would have alerted Mr. Westerink to the Musmann Article's disclosure of the quantization of difference signals in accordance with a quantization schema that varies with the dictates of a control signal, wherein the control signal varies throughout an applied next frame with changes in at least one selected characteristic of the applied next frame signals.

145.    The individuals involved in the application for and prosecution of the Johnston '377 Patent, including Mr. Netravali and Mr. Westerink, did not disclose the Musmann Article to the PTO during the prosecution of the Patent.  In addition, the individuals involved in the application for and prosecution of the Johnston '377 Patent did not disclose any prior art cumulative to the material disclosures in the Musmann Article during the prosecution of the Patent.

146.    At least Mr. Netravali was aware of the materiality of the Musmann Article to the patentability of the Johnston '377 Patent, including the patentability of claim 1 of the Patent.  In addition, at least Mr. Westerink was aware of the materiality of the Musmann Article to the patentability of the Johnston '377 Patent, including the patentability of claim 1 of the Patent.

147.    At least Mr. Netravali's intentional failure to disclose the Musmann Article constitutes inequitable conduct that renders the Johnston '377 Patent void and unenforceable.  In addition, at least Mr. Westerink's intentional failure to disclose the Musmann Article constitutes inequitable conduct that renders the Johnston '377 Patent void and unenforceable.

148.    As a third example, Section 4 of the Safranek/Johnston Article (first discussed above with respect to the '878 Patent) states:

> Each sub-band is coded using a DPCM coder with a variable uniform mid-riser quantizer. It uses a three point predictor optimized for each sub-band.  The predictor coefficients are quantized to 5 bit accuracy and set as side information.  The quantizer step size is adjusted to ensure that the perceptual criterion is just met at most critical point in the sub-band. This ensures that every point in the subband receives a sufficiently high level of coding without overcoding the most sensitive position. Due to the wide dynamic range of the perceptual threshold values, adaptation of the quantizer step size will be advantageous. However, we have just begun testing a modified step-size algorithm that responds within each sub-band to the image texture information.

A person of ordinary skill in the art would recognize that a quantization schema involving adaptation of the quantizer step size in response to the image texture information within each subband would inherently require a control signal.

149.    Section 3 of the Safranek/Johnston Article describes a perceptual masking model including sensitivity adjustment for brightness and texture masking adjustment.  In conjunction with Section 3, Section 4 of the Safranek/Johnston Article discloses to a person of skill in the art a quantization schema that varies with the dictates of a control signal, wherein the control signal varies throughout an image with changes in at least one selected characteristic of the image.

Case No. 10-CV-2618 H (CAB)

150.   A person of skill in the art would recognize that the Safranek/Johnston Article's disclosure of a quantization schema that varies with the dictates of a control signal, wherein the control signal varies throughout an image with changes in at least one selected characteristic of the image is applicable to applied video signals as well, since video input signals are composed in part of image input signals.  For example, in a subsequent article entitled "A Perceptually Tuned Sub-Band Image Coder," Mr. Safranek and Mr. Johnston declare:

> The motivation for this work has been to develop an image coder that will give nearly perceptually lossless coding of arbitrary input at as low a bitrate as possible.  With the predicted availability of moderate rate (64-128kbps) switched data networks, there will be increasing demand for transmission services utilizing high quality image transmission. Two examples of these services are remote slideshows and video catalogs.

Proc. SPIE Symp. Human Vision & Elec. Imaging: Models, Methods & Apps., Santa Clara, CA (Feb. 1990).

151.   For these reasons, a person of ordinary skill in the art would recognize that at least Sections 3 and 4 of the Safranek/Johnston Article are material to the patentability of the Johnston '377 Patent, including claim 1 of the Patent.  Indeed, Sections 3 and 4 of the Safranek/Johnston Article disclose the Johnston '377 Patent applicants' purported point of distinction between the claimed invention and the prior art.

152.   The individuals involved in the application for and prosecution of the Johnston '377 Patent did not disclose the Safranek/Johnston Article to the PTO during the prosecution of the Patent.  Mr. Safranek and Mr. Johnston, in particular, did not disclose the Safranek/Johnston Article to the PTO. Indeed, the individuals involved in the application for and prosecution of the Johnston '377 Patent did not disclose any art cumulative to the material disclosures in the Safranek/Johnston Article during the prosecution of the Patent.

153.   At least Mr. Safranek and Mr. Johnston, as the co-authors of the Safranek/Johnston Article, were aware of its material contents.  In addition, at least Mr. Safranek and Mr. Johnston were aware of the Safranek/Johnston Article's materiality to the patentability of the Johnston '377 Patent, including the patentability of claim 1 of the Patent.

154.   At least Mr. Safranek intended to deceive the PTO by intentionally failing to disclose the Safranek/Johnston Article in the application for the Johnston '377 Patent and

Case No. 10-CV-2618 H (CAB)

throughout its prosecution.  In addition, at least Mr. Johnston intended to deceive the PTO by intentionally failing to disclose the Safranek/Johnston Article in the application for the Johnston '377 Patent and throughout its prosecution.

155.    At least Mr. Safranek's intentional failure to disclose the Safranek/Johnston Article constitutes inequitable conduct that renders the Johnston '377 Patent void and unenforceable.  In addition, at least Mr. Johnston's intentional failure to disclose the Safranek/Johnston Article constitutes inequitable conduct that renders the Johnston '377 Patent void and unenforceable.

### FOURTEENTH AFFIRMATIVE DEFENSE

### (Patent Misuse)

156.    MPT's purported claims against LG Electronics are barred by the doctrine of patent misuse.

157.    LG Electronics incorporates by reference Paragraphs 76-155, supra, as if fully stated herein.

### FIFTEENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

158.    MPT's purported claims against LG Electronics are barred by the doctrine of unclean hands.

159.    LG Electronics incorporates by reference Paragraphs 76-155, supra, as if fully stated herein.

160.    LG Electronics incorporates and realleges Paragraph 73, as though set forth in full herein, related to LG Electronics' claim of violation of the license agreement of MPT's predecessors-in-interest.

161.    LG Electronics incorporates and realleges Paragraph 74, as though set forth in full herein, related to LG Electronics' claim of MPT's violation of its RAND agreement.

### SIXTEENTH ADDITIONAL DEFENSE

### (Limitation on Recovery of Costs)

162.    MPT is precluded from seeking recovery of costs by 35 U.S.C. § 278.

Case No. 10-CV-2618 H (CAB)

1

## SEVENTEENTH AFFIRMATIVE DEFENSE

2

### (No Right to Injunctive Relief)

3    163.    MPT is not entitled to injunctive relief because any injury to it is not immediate or

4    irreparable, and MPT has an adequate remedy at law for any claims it can prove.

5

## EIGHTEENTH AFFIRMATIVE DEFENSE

6

### (Improper Joinder)

7    164.    MPT's claims against LG Electronics are improperly joined with those against the

8    other Defendants to this action within the meaning of Rule 20 of the Federal Rules of Civil

9    Procedure because they do not arise out of the same transaction, occurrence, or series of

10    transactions or occurrences and/or do not involve questions of law or fact common to all

11    defendants.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 10-CV-2618 H (CAB)

## COUNTERCLAIMS OF LG ELECTRONICS AGAINST MPT

The following are counterclaims for a declaratory judgment of non-infringement, invalidity, and/or unenforceability of each of the Asserted Patents (U.S. Patent No. 5,227,878 (the "Puri '878 Patent"), and U.S. Patent No. 5,136,377 (the "Johnston '377 Patent").  LG Electronics, for its counterclaims herein, alleges as follows:

## JURISDICTION AND VENUE

1.     LG Electronics specifically realleges and incorporates herein by reference each and every allegation contained LG Electronics's Answer, *supra*, as if set forth fully herein.

2.     These counterclaims seek declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 & 2202.  The Court thus has subject matter jurisdiction of such claims pursuant to 28 U.S.C. § 1331 and 1338 as these counterclaims arise under the Patent Laws of the United States, set forth at 38 U.S.C. § 101 et seq.

3.     This Court has personal jurisdiction over Counter-defendant MPT because MPT submitted to the jurisdiction of this Court by filing its Complaint against LG Electronics.

4.     Venue is proper in this judicial district because these claims are being brought as compulsory counterclaims pursuant to Fed. R. Civ. P. 13(a), and under 28 U.S.C. §§ 1391(b) and (c) and 1400(b) because the claims set forth herein involve federal questions of United States Patent Law.

## NATURE OF THE ACTION

5.     Each of the Asserted Patents is invalid for failure to meet one or more of the conditions for patentability specified in Title 35 of the United States Code, including, without limitation, Sections 101, 102, 103, 112, and 132, and the rules, regulations, and laws pertaining thereto; and/or the Patents-in-Suit have not been directly or indirectly infringed by LG Electronics; moreover, LG Electronics, its customers, and all others have the right to manufacture, have made, use, sell, offer to sell, and import all of LG Electronics products and services accused of infringement by MPT, unhampered and unmolested by MPT.

## PARTIES

6.     Counter-claimant LG Electronics is defined above.

Case No. 10-CV-2618 H (CAB)

7.     Counter-defendant MPT states in its Complaint that it is a Delaware Statutory Trust organized under the Delaware Statutory Trust Act, 12 Del. C. §§ 3801 *et seq*.  On information and belief, MPT has as trustee Mr. Gerard A. deBlasi, an individual having a business address of 991 Route 22 West, Bridgewater, NJ, 08807.

## FIRST COUNTERCLAIM

### (Declaratory Judgment of Non-Infringement and/or Invalidity of the Puri '878 Patent)

8.     LG Electronics incorporates by reference the foregoing allegations, inclusive, as though set forth in full herein.

9.     On December 20, 2010, MPT filed a complaint against LG Electronics, designated as Civil Action No. 10 CV 02618, alleging that by making, using, offering to sell, selling and/or importing within the United States products and/or services, LG Electronics has infringed, directly and/or indirectly, the Puri '878 Patent.

10.     Each claim of the Puri '878 Patent is invalid for failure to comply with one or more of the requirements of United States Code, Title 35, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, and 132, and the rules, regulations, and laws pertaining thereto; and/or LG Electronics has not infringed and is not now infringing any valid and enforceable claim of the Puri '878 Patent, either directly, contributorily or through inducement, literally or by equivalents, and, moreover, LG Electronics, its suppliers, its customers, and all others have the right to manufacture, have made, use, sell, offer to sell, and import any LG Electronics products and services accused of infringement, unhampered and unmolested by MPT.

11.     LG Electronics is informed and believes, and on that basis alleges, that MPT denies each of the foregoing contentions.

12.     Based on MPT's filing of this suit and LG Electronics' Affirmative Defenses, a true, actual, and justiciable controversy has arisen and now exists between LG Electronics and MPT regarding the alleged infringement and validity of the Puri '878 Patent asserted by MPT against LG Electronics.

Case No. 10-CV-2618 H (CAB)

13.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, LG Electronics requests the declaration of the Court that LG Electronics does not infringe and has not infringed any claim of the Puri '878 Patent and/or the Puri '878 Patent is invalid.

14.     LG Electronics has no adequate remedy at law.

## SECOND COUNTERCLAIM

### (Declaratory Judgment of Unenforceability of the Puri '878 Patent

### Due to Inequitable Conduct)

15.     LG Electronics incorporates by reference the foregoing allegations, inclusive, as though set forth in full herein.

16.     The Puri '878 Patent is unenforceable and void due to inequitable conduct that occurred during the application for and prosecution of the Patent.

17.     LG Electronics incorporates by reference as if fully stated herein Paragraphs 76-123, supra.

18.     An actual controversy exists between the LG Electronics and MPT with respect to the enforceability of the Puri '878 Patent.  LG Electronics therefore seeks a declaration that the Puri '878 Patent is unenforceable.

19.     LG Electronics has no adequate remedy at law.

20.     LG Electronics reserves the right to supplement and amend its inequitable conduct defenses in the event that it obtains additional information material to the unenforceability of the Puri '878 Patent during the course of this litigation.

## THIRD COUNTERCLAIM

### (Declaratory Judgment of Non-Infringement and/or Invalidity of the Johnston '377 Patent)

21.     LG Electronics incorporates by reference the foregoing allegations, inclusive, as though set forth in full herein.

22.     On December 20, 2010, MPT filed a complaint against LG Electronics, designated as Civil Action No. 10 CV 02618, alleging that by making, using, offering to sell, selling and/or importing within the United States products and/or services, LG Electronics has infringed, directly and/or indirectly, the Johnston '377 Patent.

Case No. 10-CV-2618 H (CAB)

23.     Each claim of the Johnston '377 Patent is invalid for failure to comply with one or more of the requirements of United States Code, Title 35, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, and 132, and the rules, regulations, and laws pertaining thereto; and/or LG ELECTRONICS has not infringed and is not now infringing any valid and enforceable claim of the Johnston '377 Patent, either directly, contributorily or through inducement, literally or by equivalents, and, moreover LG Electronics, its suppliers, its customers, and all others have the right to manufacture, have made, use, sell, offer to sell, and import any LG Electronics products and services accused of infringement, unhampered and unmolested by MPT.

24.     LG Electronics is informed and believes, and on that basis alleges, that MPT denies each of the foregoing contentions.

25.     Based on MPT's filing of this suit and LG Electronics' Affirmative Defenses, a true, actual, and justiciable controversy has arisen and now exists between LG Electronics and MPT regarding the alleged infringement and validity of the Johnston '377 Patent asserted by MPT against LG Electronics.

26.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, LG Electronics requests the declaration of the Court that LG Electronics does not infringe and has not infringed any claim of the Johnston '377 Patent and/or the Johnston '377 Patent is invalid.

27.     LG Electronics has no adequate remedy at law.

### **FOURTH COUNTERCLAIM**

### **(Declaratory Judgment of Unenforceability of the Johnston '377 Patent**

### **Due to Inequitable Conduct)**

28.     LG Electronics incorporates by reference the foregoing allegations, inclusive, as though set forth in full herein.

29.     The Johnston '377 Patent is unenforceable and void due to inequitable conduct that occurred during the application for and prosecution of the Patent.

30.     LG Electronics incorporates by reference as if fully stated herein Paragraphs 76, 124-155, supra.

Case No. 10-CV-2618 H (CAB)

31.     An actual controversy exists between the LG Electronics and MPT with respect to the enforceability of the Johnston '377 Patent.  LG Electronics therefore seeks a declaration that the Johnston '377 Patent is unenforceable.

32.     LG Electronics has no adequate remedy at law.

33.     LG Electronics reserves the right to supplement and amend its inequitable conduct defenses in the event that it obtains additional information material to the unenforceability of the Johnston '377 Patent during the course of this litigation.

Dated:  March 21, 2011                          FISH & RICHARDSON P.C.


                                                By:  /s/ Lara S. Garner
                                                     Lara S. Garner (SBN 234701)
                                                     lgarner@fr.com

                                                Attorneys for Defendants LG Electronics, Inc.,
                                                LG Electronics U.S.A., Inc., LG Electronics
                                                Mobilecomm U.S.A.

1

## **JURY DEMAND**

2          Pursuant to Local Rule CV-38.1 and Fed. R. Civ. P. 38, defendant and counter-claimant

3   LG ELECTRONICS hereby demands a trial by jury on all issues relating to MPT so triable in this

4   action.

5   Dated:  March 21, 2011                              FISH & RICHARDSON P.C.

6

7

8                                                        By:  /s/ Lara S. Garner
                                                              Lara S. Garner (SBN 234701)
9                                                             lgarner@fr.com

10                                                       Attorneys for Defendants LG Electronics, Inc.,
                                                         LG Electronics U.S.A., Inc., LG Electronics
11                                                       Mobilecomm U.S.A.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2          The undersigned hereby certifies that a true and correct copy of the above and foregoing

3 document has been served on March 21, 2011 to all counsel of record who are deemed to have

4 consented to electronic service via the Court's CM/ECF system per Fed. R. Civ. P. 5(b)(3).  Any

5 other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

6

7 Dated:   March 21, 2011

8                                                                By:  /s/ Lara S. Garner

9                                                                     Lara S. Garner (SBN 234701)
                                                                      lgarner@fr.com

10                                                               Attorneys for Defendants LG Electronics, Inc.,
                                                                 LG Electronics U.S.A., Inc., LG Electronics
11                                                               Mobilecomm U.S.A.

12
   11140362.doc
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38