# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MULTIMEDIA PATENT TRUST,<br><br>                              Plaintiff,<br>vs.<br><br>APPLE INC., et al.,<br><br>                            Defendants. | CASE NO. 10-CV-2618-H (KSC)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' <u>DAUBERT</u> MOTION TO EXCLUDE PLAINTIFF'S DAMAGES EXPERTS**<br><br>[Doc. No. 495, 641] |

On October 23, 2012, Defendants filed a <u>Daubert</u> motion to exclude MPT's damages experts. (Doc. No. 495) On November 6, 2012, MPT filed its response in opposition. (Doc. No. 597.) On November 13, 2012, Apple and LG filed their reply. (Doc. No. 625.) On November 17, 2012, MPT filed a notice of supplemental damages expert reports. (Doc. No. 638.) On November 19, 2012, Apple and LG filed a supplemental brief in support of their motion. (Doc. No. 641.) On November 20, 2012, the Court held a hearing on the matter. Christopher Mathews, Frederick Lorig, Sidford Brown, and Diane Hutnyan appeared for MPT. Justin Barnes, Kelly Hunsaker, Michael Tyler, Lara Garner, Richard Sterba, and Michael McKeon appeared for Apple and LG. Sarita Venkat appeared for Apple. For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** Apple and LG's <u>Daubert</u> motion.

**BACKGROUND**

On December 20, 2010, Plaintiff Multimedia Patent Trust ("MPT") filed a complaint for patent infringement against Defendants Apple, Inc. ("Apple"), LG[1], and Canon.[2] (Doc. No. 1, Compl.) The complaint alleges that Defendants are liable for infringement of one or more of three patents related to video compression technology: U.S. Patent Nos. 4,958,226 ("the '266 Patent"), 5,227,878 ("the '878 Patent"), and 5,136,377 ("the '377 Patent") (collectively the "Patents-in-Suit"). (Id.) On March 21, 2011, Apple, LG, and Canon filed their answers. (Doc. Nos. 38-39, 41.) On November 9, 2012, the Court granted Canon's motion for summary judgment of its affirmative defense of patent exhaustion, removing Canon as a Defendant from this case. (Doc. No. 608 at 9-10.)

**DISCUSSION**

**I. Legal Standard for a Daubert Motion to Exclude Expert Testimony**

A district court's decision to admit expert testimony under Daubert in a patent case follows the law of the regional circuit. Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1390-91 (Fed. Cir. 2003). When considering expert testimony offered pursuant to Rule 702, the trial court acts as a "gatekeeper" by "making a preliminary determination of whether the expert's testimony is reliable." Elsayed Mukhtar v. Cal. State Univ., Hayward, 299 F.3d 1053, 1063 (9th Cir. 2002); see Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993). Under Rule 702 of the Federal Rules of Evidence, a court may permit opinion testimony from an expert only if such testimony "will assist the trier of fact" and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

"The test for reliability [of expert testimony] is flexible and depends on the discipline

---

[1] "LG" includes LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG Electronics Mobilecomm U.S.A., Inc.

[2] "Canon" includes Canon U.S.A., Inc. and Canon, Inc.

1  involved." Wagner v. Cnty. of Maricopa, 2012 U.S. App. LEXIS 23631, at *14 (9th Cir. Nov.
2  16, 2012). "Under Daubert, the district judge is 'a gatekeeper, not a fact finder.' When an
3  expert meets the threshold established by Rule 702 as explained in Daubert, the expert may
4  testify and the jury decides how much weight to give that testimony." Primiano v. Cook, 598
5  F.3d 558, 564-65 (9th Cir. 2010); see also Micro Chem., 317 F.3d at 1392 ("When . . . the
6  parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate
7  the correctness of facts underlying one expert's testimony."). "'[T]he test under Daubert is not
8  the correctness of the expert's conclusions but the soundness of his methodology.'" Primiano,
9  598 F.3d at 564. "Shaky but admissible evidence is to be attacked by cross examination,
10 contrary evidence, and attention to the burden of proof, not exclusion." Id. (citing Daubert,
11 509 U.S. at 594, 596); accord i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 856 (Fed. Cir.
12 2010).
13      Whether to admit or exclude expert testimony lies within the trial court's discretion.
14 GE v. Joiner, 522 U.S. 136, 141-42 (1997); United States v. Calderon-Segura, 512 F.3d 1104,
15 1109 (9th Cir. 2008). The Ninth Circuit has explained that "[a] trial court not only has broad
16 latitude in determining whether an expert's testimony is reliable, but also in deciding how to
17 determine the testimony's reliability." Mukhtar v. Cal. State Univ., 299 F.3d 1053, 1064 (9th
18 Cir. 2002).

19 **II.   Legal Standards for Calculating Patent Damages**

20      "Upon finding for the claimant the court shall award the claimant damages adequate to
21 compensate for the infringement, but in no event less than a reasonable royalty for the use
22 made of the invention by the infringer, together with interest and costs as fixed by the court."
23 35 U.S.C. § 284. Two alternative methods exist for calculating damages in a patent case; they
24 "are the patentee's lost profits and the reasonable royalty he would have received through
25 arms-length bargaining." Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir.
26 2009). MPT does not contend that it is entitled to lost profits. [See Doc. No. 495-1,
27 Declaration of Justin Barnes, Exs. A, C.] Accordingly, damages is this case should be
28 calculated by determining the reasonable royalty MPT would have received through

arms-length negotiation.  See Lucent, 580 F.3d at 1324.

To calculate the reasonable royalty, patentees generally consider a hypothetical negotiation, in which the asserted patent claims are assumed valid, enforceable, and infringed, and attempt "to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."  Lucent, 580 F.3d at 1324-25; see also Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1554 n.13 (Fed. Cir.1995) (en banc).  This hypothetical negotiation "necessarily involves an element of approximation and uncertainty."  Lucent, 580 F.3d at 1325; see also Fromson v. Western Litho Plate & Supply Co., 853 F.2d 1568, 1574 (Fed. Cir. 1988) ("Determining a fair and reasonable royalty is often . . . a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge").  "Still, a reasonable royalty analysis requires a court to hypothesize, not to speculate."  ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 869 (Fed. Cir. 2010).  "A damages theory must be based on 'sound economic and factual predicates.'"  LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1311 (Fed. Cir. 2002)).

In determining the reasonable royalty that would have been agreed to at the hypothetical negotiation, parties in patent cases frequently utilize the fifteen factors enunciated in Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  The Federal Circuit has expressly "sanctioned the use of the Georgia-Pacific factors to frame the reasonable royalty inquiry."  Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1317 (Fed. Cir. 2011).

A hypothetical negotiation can result in either a lump-sum license or a running royalty license.  See Lucent, 580 F.3d at 1326.  A lump-sum license is an up-front payment in full for the invention that involves uncertainty about "whether the technology is commercially successful or even used."  Id.  In contrast, a running royalty license is directly tied to how often the invention is incorporated into products by the licensee and is calculated by multiplying the proposed royalty rate by the proposed royalty base.  See id. at 1326, 1338-39.

"The burden of proving damages falls on the patentee."  Lucent, 580 F.3d at 1324.  To

properly carry this burden, the patentee must sufficiently tie the expert testimony on damages to the facts of the case. Uniloc, 632 F.3d at 1315 (citing Daubert, 509 U.S. at 591).

### III.   Mr. Yurkerwich's Damages Analysis

MPT's damages expert Mr. Yurkerwich's analysis begins by giving a general overview of the Patents-in-Suit, Alcatel-Lucent, MPT, IPValue, MPEG-LA, licenses involving the Patents-in-Suit, MPT's licensing activity, and the accused products. (Doc. No. 495-1, Declaration of Justin Barnes Ex. A ¶¶ 5-34, Ex. C. ¶¶ 5-40.) Mr. Yurkerwich then examines Apple and LG documents to analyze the Defendants' use of the H.264 standard. (Id. Ex. A ¶¶ 35-39, Ex. C. ¶¶ 41-62.)

Mr. Yurkerwich then utilizes the market approach to analyze the value of the Patents-in-Suit. (Doc. No. 495-1, Declaration of Justin Barnes Ex. A ¶¶ 44-71, Ex. C. ¶¶ 67-94.) Under this approach, Mr. Yurkerwich analyzes various licenses to the Patents-in-Suit. (Id.) Mr. Yurkerwich first identifies four Lucent licenses that provided Lucent with an initial lump sum payment and then a per unit royalty of $1.50 to $2.00 depending on certain circumstances for three of the licenses and a 0.5% running royalty for the fourth license. (Id. Ex. A ¶¶ 47-50, Ex. C ¶¶ 70-73.) Mr. Yurkerwich then identifies the 32 licenses that MPT has received for the Patents-in-Suit, which consists mostly of lump sum agreements. (Id. Ex. A ¶¶ 51-59, Ex. C ¶¶ 74-82.) Out of the 32 licenses, Mr. Yurkerwich analyzes the nine licenses that he had unit data for and calculates that the average per unit rate for this group of licenses was $0.86 per unit.[3] (Id. Ex. A ¶¶ 60-63, Ex. C ¶¶ 83-86.) Mr. Yurkerwich then explains that MPT's licenses had litigation discount percentages from 20% to 55%, and that based on these litigation discounts the actual value of the licenses–if its is assumed that the patents are infringed and valid–should be adjusted upward by a multiple of between 1.25 and 2. (Id. Ex. A ¶¶ 66-71, Ex. C ¶¶ 89-94.)

Mr. Yurkerwich then takes this information and analyzes the fifteen Georgia-Pacific

---

[3] On November 15, 2012, MPT served on Defendants supplement damages expert reports where Mr. Yurkerwich analyzes a tenth MPT lump sum license that it recently entered into with Motorola/Google. (Doc. No. 637, Declaration of Sidford Brown Exs. 1-2.)

factors to determine the reasonable royalty the parties would have agreed to during the hypothetical negotiation. (Doc. No. 495-1, Declaration of Justin Barnes Ex. A ¶¶ 74-97, Ex. C. ¶¶ 95-121.) Mr. Yurkerwich concludes that the reasonable royalty for Apple and LG's alleged infringement that would have been reached at the hypothetical negotiation would be $1.50 per unit, resulting in a total reasonable royalty of $195.9 million for Apple and $61.3 million for LG.[4] (Id. Ex. A ¶¶ 4, 96-98, Ex. C ¶¶ 4, 118-22.) In explaining the reasonableness of his $1.50 per unit royalty rate, Mr. Yurkwich states that the $1.50 per unit rate would be approximately 0.25% of Apple's accused product revenue and approximately 0.78% of LG's accused product revenue. (Id. Ex. A ¶ 97, Ex. C ¶¶ 120-21.) Mr. Yurkerwich also states that at a 1% royalty rate the average per unit amount for Apple's accused products would be $6.00 based on their average selling price of $600 and the average per unit amount for LG's products would be $1.92 based on their average selling price of $192. (Id. Ex. A ¶ 96, Ex. C ¶ 119.)

## IV.   Entire Market Value Rule

Under the entire market value rule, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product only "[i]If it can be shown that the patented feature drives the demand for an entire multi-component product." LaserDynamics, 694 F.3d at 67; see also Uniloc, 632 F.3d at 1318 ("The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'"). "In other words, '[t]he entire market value rule allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for customer demand.'" LaserDynamics, 694 F.3d at 67 (quoting Lucent, 580 F.3d at 1336). The entire market value rule is "derived from Supreme Court precedent requiring that 'the patentee . . . must in every case give evidence

---

[4] On October 24, 2012, Mr. Yurkerwich revised his damages expert report for LG to account for the accused products struck by the Court in its Order granting in part and denying in part LG's motion to strike MPT's final infringement contentions. (Doc. No. 625, Declaration of Justin Barnes Ex. T.) In the revised damages expert report, Mr. Yurkerwich concludes that the total reasonable royalty for LG would now be $9.1 million. (Id. ¶¶ 4, 98.)

1  tending to separate or apportion the defendant's profits and the patentee's damages between
2  the patented feature and the unpatented features, and such evidence must be reliable and
3  tangible, and not conjectural or speculative,' or show that 'the entire value of the whole
4  machine, as a marketable article, is properly and legally attributable to the patented feature.'"
5  Uniloc, 632 F.3d at 1318 (quoting Garretson v. Clark, 111 U.S. 120, 121 (1884)).  "Where
6  small elements of multi-component products are accused of infringement," and the entire
7  market value rule has not been satisfied, "it is generally required that royalties be based not on
8  the entire product, but instead on the 'smallest salable patent-practicing unit.'"
9  LaserDynamics, 694 F.3d at 67 (quoting Cornell Univ. v. Hewlett-Packard Co., 609 F. Supp.
10 2d 279, 283, 287-88 (N.D.N.Y. 2009) (Rader, J.)).

11       The patentee bears the burden of proving that the entire market value rule has been
12 satisfied.  See IP Innovation L.L.C. v. Red Hat, Inc., 705 F. Supp. 2d 687, 690 (E.D. Tex.
13 2010) (Rader, J.); see also Lucent, 580 F.3d at 1336 ("[T]he patentee must prove that the
14 patent-related feature is the basis for customer demand." (quotation marks omitted)).  A
15 damages expert that improperly utilizes the entire market value rule in calculating the
16 reasonable royalty should be excluded.  See, e.g., IP Innovation, 705 F. Supp. 2d at 689-91.

17       Defendants argue that Mr. Yurkerwich's damages analysis violates the entire market
18 value rule.  (Doc. No. 495 at 5-12.)  Specifically, Defendants argue that Mr. Yurkerwich's
19 damages analysis is based on the entire market value of the accused products without
20 performing any apportionment.  (Id.)  In response, MPT argues that Mr. Yurkerwich's analysis
21 does not violate the entire market value rule because Mr. Yurkerwich's per-unit royalty is not
22 based on the entire market value of the accused products.  (Doc. No. 597 at 5-12.)  MPT argues
23 that because Mr. Yurkerwich's royalty is based on the number of units sold, the entire market
24 value rule is inapplicable.  (Id. at 6, 10-11.)

25       In his expert reports, Mr. Yurkerwich concludes that the reasonable royalty for Apple
26 and LG's infringement that would have been reached at the hypothetical negotiation would be
27 $1.50 per unit.  (Doc. No. 495-1, Declaration of Justin Barnes Ex. A ¶¶ 4, 96-98, Ex. C ¶¶ 4,
28 118-22.)  The Court concludes that Mr. Yurkerwich's $1.50 per unit royalty does not violate

1  the entire market value rule.  The entire market value rule is applicable when a patentee uses
2  the revenue or profits of an entire accused product as his royalty base.  See LaserDynamics,
3  694 F.3d at 67; Uniloc, 632 F.3d at 1318; Garretson, 111 U.S. at 121.  In having a royalty of
4  $1.50 per product, Mr. Yurkerwich's royalty does not use Defendants' revenues or profits as
5  a royalty base.  His royalty is based on the number of units sold regardless of the amount of
6  revenue or profits derived from the various products.  Therefore, Mr. Yurkerwich's $1.50 per
7  unit royalty does not rely on the entire market value of Defendants' accused products, and the
8  entire market value rule does not apply.

9  Defendants argue that Mr. Yurkerwich's $1.50 per unit royalty is actual based on the
10 entire value of the accused products because he relies on MPT's purported practice to negotiate
11 licenses in which payments were based on a 1%, 0.5%, or 0.1% royalty of revenue, with a
12 minimum payment of $1.50 per unit.  (Doc. No. 495 at 7-9.)  Although Mr. Yurkerwich relies
13 on this alleged licensing practice, he does not seek a 1%, 0.5%, or 0.1% royalty rate in his
14 report.  He seeks a royalty rate of $1.50 per unit, the minimum payment under the practice.
15 This $1.50 minimum per unit rate does not depend on the accused products' revenues or
16 profits, and therefore the entire market value rule is not applicable.

17 Defendants attempt to argue that Mr. Yurkerwich's $1.50 per unit royalty is similar to
18 the royalty rate in Lucent v. Microsoft, which this Court found violated the entire market value
19 rule.  (Doc. No. 495 at 5; Doc. No. 625 at 2-3.)  The Court disagrees.  In Lucent, the patentee
20 sought a 1% royalty rate and attempted to argue that the entire market value rule was not
21 implicated by its proposed royalty so long as it stated the defendant's revenue in terms of unit
22 price and number of units rather than in terms of total dollar revenue.  See Lucent Techs., Inc.
23 v. Microsoft Corp., 2011 U.S. Dist. LEXIS 75504, at *29-31 (S.D. Cal. Jul. 13, 2011).  This
24 Court found that the entire market value rule applied because the patentee was seeking a
25 royalty based on the entire market value of the accused products, i.e., a percentage of the
26 products' revenue.  See id.  Here, MPT is not seeking a royalty rate based on a percentage of
27 Defendants' revenue, as the patentee in Lucent was; instead, MPT is requesting a per unit
28 royalty that is $1.50 per product regardless of the revenue derived from the products.

Mr. Yurkerwich's damages analysis does not end with his conclusion that a $1.50 per unit would be the appropriate reasonable royalty in this case. In an effort to support his $1.50 per unit royalty, Mr. Yurkwich states that the $1.50 per unit rate would be approximately 0.25% of Apple's accused product revenue and approximately 0.78% of LG's accused product revenue. (Doc. No. 495-1, Declaration of Justin Barnes Ex. A ¶ 97, Ex. C ¶¶ 120-21.) Mr. Yurkerwich also states that at a 1% royalty rate the average per unit amount for Apple's accused products would be $6.00 based on their average selling price of $600 and the average per unit amount for LG's products would be $1.92 based on their average selling price of $192. (Id. Ex. A ¶ 96, Ex. C ¶ 119.) These statements violate the entire market rule. See Uniloc, 632 F.3d at 1321 ("[T]he fact that the entire market value was brought in as only a 'check' is of no moment."). In making these statements, Mr. Yurkerwich relies on the total revenues of the accused products to support his royalty rate. Therefore, the entire market value rule is applicable to these statements. See LaserDynamics, 694 F.3d at 67; Uniloc, 632 F.3d at 1318; Garretson, 111 U.S. at 121. A patentee may only rely on the entire market value of the accused products in its reasonable royalty analysis if it can show that the patented feature, here video compression technology, drives the demand for the entire accused products. See LaserDynamics, 694 F.3d at 67. MPT does not even attempt to make such a showing.

Instead, MPT argues that its market approach complies with the entire market value rule. (Doc. No. 597 at 3-10.) MPT argues that its reasonable royalty analysis complies with the entire market value rule because Mr. Yurkerwich's analysis properly performs an apportionment of the royalty base by relying on comparable licenses. (Id. at 5-10.) The Court first notes that the entire market value rule is not satisfied simply because a patentee relies on comparable licenses in its damages analysis. Whether a reasonable royalty analysis properly relies on comparable licenses is a different legal inquiry from whether a reasonable royalty analysis violates the entire market value rule. See, e.g., LaserDynamics, 694 F.3d at 66-70, 79-81 (performing a separate analysis for determining whether the entire market value rule was violated and whether the damages were based on comparable licenses); Lucent, 580 F.3d at 1325-32, 1336-39 (same). However, the use of the accused products' entire market value as

1  a royalty base can be economically justified where sophisticated parties have entered into
2  "agreements that base the value of the patented invention as a percentage of the commercial
3  products' sale price." Lucent, 580 F.3d at 1339; see also Microsoft Corp. v. Motorola, Inc.,
4  2012 U.S. Dist. LEXIS 152244, at *29 (W.D. Wash. Oct. 22, 2012); Mondis Tech., Ltd. v. LG
5  Elecs., Inc., 2011 U.S. Dist. LEXIS 78482, at *17-18 (E.D. Tex. Jun. 14, 2011).

6       Here, MPT attempts to rely on several of its lump sum agreements with various
7  licensees to justify its use of the entire market value of the accused products. (Doc. No. 597
8  at 6-7; Doc. No. 495-1, Declaration of Justin Barnes Ex. A ¶¶ 82-84, Ex. C ¶¶ 105-07.) Lump
9  sum agreements are inherently not based on a percentage of the commercial products' sale
10 price because they are entered into without the parties knowing the full extent to which the
11 licensee will use the invention and the revenue and profits the licensee will derive from that
12 use.[5] See Lucent, 580 F.3d at 1326 ("[A]n upfront, paid-in-full royalty removes, as an option
13 for the licensee, the ability to reevaluate the usefulness, and thus the value, of the patented
14 technology as it is used and/or sold by the licensee."). MPT also relies on three agreements
15 entered into by Lucent that contain royalty rates of $1.50 to $2.00 per unit. (Doc. No. 495-1,
16 Declaration of Justin Barnes Ex. A ¶ 81, Ex. C ¶ 104.) Because the royalty rates in these
17 Lucent agreements were based per unit dollar amounts, the royalty rates were not based on the
18 covered products' revenues or profits. Therefore, MPT's evidence of comparable licenses is
19 insufficient to justify its use of the entire market value of the Defendants' accused products as

---

[5] In his expert reports, Mr. Yurkerwich states: "MPT and the licensees chose to calculate the amounts potentially owed based on applying the revenue and per unit rates to the sales of potentially infringing products." (Doc. No. 495-1, Declaration of Justin Barnes Ex. A ¶ 84, Ex. C ¶ 107.) Even assuming this is true, Mr. Yurkerwich fails to provide any evidence showing whether the ultimate lump sum payments were based on revenue rate, which involves the entire market value of the products, or a per unit rate, which does not. In addition, Mr. Yurkerwich does not support his statement with any language contained in the actual agreements. Mr. Yurkerwich's statement appears to be based on MPT's purported licensing policy as explained by its licensing trustee, Mr. DeBlasi. (Id. Ex. A ¶¶ 14-23; Ex. C ¶¶ 15-24.) MPT and Mr. Yurkerwich have failed to present any evidence showing that both parties to these agreements, not just MPT, understood that the lump sum payments were based on the revenue of the relevant products and were a reflection of a MPT's royalty models. (See also id. Ex. A ¶ 22; Ex. C ¶ 23 (explaining that MPT royalty models "were not intended to document the ultimate payments agreed to with the licensee").)

part of its damages analysis.

In addition, it is unnecessary for Mr. Yurkerwich to state his royalty rate as a percentage of Defendants' revenue or state what a 1% royalty of Defendants' accused products would be because his ultimate conclusion–based on the information he relied on–is that a reasonable royalty would be a rate of $1.50 per product.  Under these circumstances, any discussion of the Defendants' total revenue carries a substantial danger of unfair prejudice to the Defendant. See Uniloc, 632 F.3d at 1320 ("The disclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.").  Therefore, the Court also concludes that any reference to the royalty rate as a percentage of Defendants' revenue should be excluded under Federal Rule of Evidence 403 because the probative value is substantially outweighed by the danger of unfair prejudice to the Defendants.  Accordingly, the Court excludes Mr. Yurkerwich's testimony and damages analysis to the extent it relies on or is based on Defendants' revenues or profits of the accused products.

**V.    License Comparability**

Georgia-Pacific factor 1 considers: "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." Georgia-Pacific, 318 F. Supp. at 1120.  For a damages expert to rely on a prior license, "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." Uniloc, 632 F.3d at 1317.  Therefore, "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit." Lucent, 580 F.3d at 1325.

A patentee may not rely on license agreements that are "'radically different from the hypothetical agreement under consideration' to determine a reasonable royalty." Uniloc, 632 F.3d at 1316 (quoting Lucent, 580 F.3d at 1328); see also, e.g., Wordtech Sys. v. Integrated Networks Solutions, Inc., 609 F.3d 1308, 1320 (Fed. Cir. 2010) (declining to find licenses comparable because they "arose from divergent circumstances and covered different material"); ResQNet.com, 594 F.3d at 870 (criticizing damages expert for relying on licenses

that showed no "discernible link to the claimed technology"). Further, "comparisons of past patent licenses to the infringement must account for 'the technological and economic differences' between them." Wordtech, 609 F.3d at 1320 (quoting ResQNet, 594 F.3d at 873); see also Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1211 (Fed. Cir. 2010) ("[U]se of past patent licenses under factors 1 and 2 must account for differences in the technologies and economic circumstances of the contracting parties."). Moreover, "alleging a loose or vague comparability between different technologies or licenses does not suffice." LaserDynamics, 694 F.3d at 79. The testimony of a damages expert in a patent suit who relies on non-comparable licenses in reaching his royalty rate should be excluded. See, e.g., IP Innovation L.L.C., 705 F. Supp. 2d at 690-91.

Defendants argue that the nine MPT licenses Mr. Yurkerwich primarily relies on in his analysis are not comparable to the license that would have been reached at the hypothetical negotiation as a matter of law. (Doc. No. 625 at 10.) Defendants point out that the MPT licenses grant rights to additional patents, include international rights, were related to different products, were in settlement of active litigation, and are dated several years after Apple's hypothetical negotiation date. (Id.) However, under Federal Circuit precedent, a patentee may rely on licenses that are different from the hypothetical agreement as long as they are not "radically different." Uniloc, 632 F.3d at 1316. Defendants have failed to show that these licenses are radically different. Indeed, Defendants' own damages expert relies on some of these MPT licenses in performing his reasonable royalty analysis despite the differences noted by Defendants. (Doc. No. 597, Declaration of Sidford Brown Ex. 2 ¶ 58, Ex. 3 ¶ 66.) A damages expert may rely on comparable licenses that are different from the hypothetical agreement as long as he "account[s] for 'the technological and economic differences' between them." Wordtech, 609 F.3d at 1320. Here, Mr. Yurkerwich acknowledges the differences noted by Defendants and explains how these differences do or do not affect his reasonable royalty calculation. (Doc. No. 495-1, Declaration of Justin Barnes Ex. A ¶¶ 14-23, 51-71, 80-87, Ex. C ¶¶ 15-24, 74-94, 103-10.) For example, Mr. Yurkerwich explains that MPT's licensing practice was not dependent on the number of patents being licensed and foreign

royalties were of limited importance in MPT's royalty models, and Mr. Yurkerwich provides a basis to adjust the royalties of these licenses to account for the fact that they were reached in settlement of litigation. (Id. Ex. A ¶¶ 18, 58, 66-71, Ex. C ¶¶ 19, 81, 89-94; Doc. No. 637, Declaration of Sidford Brown Ex. 1 ¶ 8, 11, Ex. 2 ¶ 8, 11.) Defendants may argue that some of these explanations are not credible. However, shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion. Primiano, 598 F.3d at 564; i4i, 598 F.3d at 856.

Defendants also argue that Mr. Yurkerwich's analysis is improper because he relies on only nine of the 32 MPT licenses in performing his reasonable royalty analysis. (Doc. No. 495 at 15-18; Doc. No. 625 at 9-10.) Defendants argue that Mr. Yurkerwich impermissibly cherry picked these nine licenses to inflate his proposed royalty rate. (Id.) But, "Federal Circuit caselaw only requires a damages expert to rely on comparable licenses. It does not require an expert to rely on all comparable licenses . . . ." Dataquill Ltd. v. High Tech Computer Corp., 2012 U.S. Dist. LEXIS 53164, at *17 (S.D. Cal. Apr. 16, 2012) (citing Uniloc, 632 F.3d at 1316; Wordtech, 609 F.3d at 1320; ResQNet.com, 594 F.3d at 870). Indeed, Defendants' own damages expert relies on several licenses in his damages analysis and concludes that some are more useful to the reasonable royalty analysis than others. (Doc. No. 597, Declaration of Sidford Brown Ex. 2 ¶¶ 43, 58, Ex. 3 ¶¶ 52, 66.) Mr. Yurkerwich explains in his expert reports that he relied on these nine licenses and not all 32 licenses because these are the only licenses for which he was able to locate the necessary per unit data. (Doc. No. 495-1, Declaration of Justin Barnes Ex. A ¶ 61, Ex. C ¶ 84.) Defendants may disagree with Mr. Yurkerwich's decision to rely on these nine licenses, but the proper recourse then is for Defendants to present contrary evidence and attack Mr. Yurkerwich's testimony on cross-examination rather than for the Court to exclude Mr. Yurkerwich's testimony. See Primiano 598 F.3d at 564; Dataquill, 2012 U.S. Dist. LEXIS 53164, at *17-18.

Finally, Defendants argue that Mr. Yurkerwich improperly converts the nine MPT lump sum licenses into running royalties. (Doc. No. 495 at 18-20.) Lump-sum agreements can be relevant to running royalty damages, and vice versa, but "some basis for comparison must exist

in the evidence presented to the jury." Wordtech, 609 F.3d at 1320 (quoting Lucent, 580 F.3d at 1330); accord Whitserve, LLC v. Computer Packages, Inc., 694 F.3d 10, 30 (Fed. Cir. 2012). Here, Mr. Yurkerwich has provided a basis for comparison by relying on MPT's unit data for these agreements and information about MPT's licensing policies and calculations. (Doc. No. 495-1, Declaration of Justin Barnes Ex. A ¶¶ 60-63, Ex. C ¶¶ 83-86.) See, e.g., Dataquill, 2012 U.S. Dist. LEXIS 53164, at *16-17. Therefore, this is not a case where the expert "did not offer any testimony to explain how [the] payments could be converted to a royalty rate." Whitserve, 694 F.3d at 30; see also Lucent, 580 F.3d at 1328. Accordingly, the Court declines to exclude Mr. Yurkerwich's damages analysis based on his reliance on the nine MPT licenses.

## VI. Established Royalty

Defendants argue that the Court should exclude Mr. Yurkerwich from opining that MPT has an "established royalty" or a "licensing program" with established rates because he has not satisfied the five-part test from Rude v. Wescott, 130 U.S. 152 (1889) to prove an established royalty. (Doc. No. 495 at 13-15.) In response, MPT argues that Defendants misconstrue Mr. Yurkerwich's analysis. (Doc. No. 597 at 23-24.) MPT argues that Mr. Yurkerwich may consider MPT's licenses under Georgia-Pacific factor 1 without establishing that there is a single unitary established royalty. (Id.)

The Court agrees with MPT. In his expert reports, Mr. Yurkerwich's does not opine that MPT's licensing policy constituted a single established royalty or that MPT had established rates. Mr. Yurkerwich simply states MPT's licensing policy and relies on that information to interpret the MPT licenses under Georgia-Pacific factor 1. (Doc. No. 495-1, Declaration of Justin Barnes Ex. A ¶¶ 14-23, 51-65, 80-87, Ex. C ¶¶ 15-24, 74-86, 103-10.) Because Mr. Yurkerwich does not contend that there is an established royalty, there is no need for him to show that the five-part test from Rude v. Wescott has been satisfied in this case. See Caluori v. One World Techs., Inc., 2012 U.S. Dist. LEXIS 25508, at *12 n.6 (C.D. Cal. Feb. 27, 2012) (explaining that a expert may rely on evidence to show a reasonable royalty even if it does not constitute proof of an established royalty).

**VII. Reliance on Industry Data**

Defendants argue that Mr. Yurkerwich and MPT's other expert, Prof. Teece, improperly rely on generic industry data that has no nexus to the parties, the patents, or the accused products. (Doc. No. 495 at 24-25.) In <u>Uniloc</u>, the Federal Circuit explained that evidence relevant to the calculation of a reasonable royalty "must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time." 632 F.3d at 1318. Therefore, a damages expert's testimony should not be based on "an arbitrary, general rule, unrelated to the facts of this case." <u>Id.</u> (granting new trial on damages based on the expert's use of the 25% rule in forming his damages opinion); <u>see also, e.g.</u>, <u>Oracle Am., Inc. v. Google Inc.</u>, 798 F. Supp. 2d 1111, 1119-21 (N.D. Cal. 2011) (excluding expert testimony based on the Nash bargaining solution).

In his expert report, Mr. Yurkerwich relies on "various industry surveys" to support his calculation of the litigation discount that should be applied to MPT's licenses. (Doc. No. 495-1, Declaration of Justin Barnes, Ex. A ¶ 69, Ex. C ¶ 92.) Mr. Yurkerwich states "[t]he probabilities of success in these surveys could be instructive when attempting to quantify this validity and infringement discount." (<u>Id.</u>) Prof. Teece also relies on these same industry surveys in his expert reports. (<u>Id.</u> Ex. O ¶¶ 65-68, Ex. P ¶¶ 64-67.) In addition, Prof. Teece relies on industry royalty rates to support the reasonableness of MPT's licensing policies. (<u>Id.</u> Ex. O ¶¶ 74-98, Ex. P ¶¶ 73-97.) This generic industry data is not tethered to the relevant facts and circumstances of the present case. Indeed, in its opposition, MPT fails to provide any explanation of how this industry data is related to the facts in this case. (<u>See</u> Doc. No. 597 at 24-25.) Therefore, any damages testimony based on this industry data should be excluded. <u>See</u> <u>Uniloc</u>, 632 F.3d at 1318; <u>Oracle</u>, 798 F. Supp. 2d at 1119-21. Accordingly, the Court excludes Mr. Yurkerwich and Prof. Teece's expert testimony to the extent it relies on or is based on generic industry data as part of their damages analysis.

///

///

**Conclusion**

After consideration of the parties' briefs and the arguments of counsel, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants <u>Daubert</u> motion to exclude Mr. Yurkwerwich's damages analysis. The Court excludes Mr. Yurkerwich's testimony and damages analysis to the extent it relies on or is based on Defendants' revenues or profits of the accused products. The Court excludes Mr. Yurkerwich and Prof. Teece's expert testimony to the extent it relies on or is based on generic industry data as part of their damages analysis. The Court denies the remainder of Defendants' motion to exclude without prejudice to any contemporaneous objections at trial made outside the presence of the jury.

**IT IS SO ORDERED**.

Dated: November 20, 2012

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT